UNITED STATES of America, Appellee,

v.

Stephen O. MASSE,
Defendant, Appellant.

No. 85–1409.

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1986.

Decided April 21, 1987.

James F.X. Dinneen, Boston, Mass., for defendant, appellant.

Gary S. Katzmann, Asst. U.S. Atty., with whom Robert S. Mueller, III, U.S. Atty., Boston, Mass., was on brief for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Stephen O. Masse was convicted in the United States District Court for the District of Massachusetts for distributing cocaine in violation of 21 U.S.C. § 841 (1982) and 18 U.S.C. § 2 (1982). He assigns a number of errors on appeal, none of which we find has merit. We affirm.

I. FACTS

Masse was indicted following an undercover operation conducted by the United States Drug Enforcement Agency ("DEA"). On November 6, 1984, DEA agent Fencer, posing as a drug buyer,

made three telephone calls to Joseph Waterhouse seeking to buy one pound of cocaine. After discussing the price and other related issues, the two men agreed they would consummate the transaction the next day, November 7, 1984, at the Holiday Inn on Blossom Street in downtown Boston.

At about 1:30 p.m. on November 7, Waterhouse, accompanied by two others, arrived in a white Grand Prix at the Holiday Inn. The driver of the car was subsequently identified as appellant Masse. Masse and Waterhouse left the car and began walking toward the hotel's Blossom Street entrance. As Waterhouse approached Fencer, who was standing near the entrance, Masse continued into the hotel lobby. He stayed there briefly before leaving the hotel through its Cambridge Street exit. Two DEA agents, Boeri and Reilly, who were watching from their car, saw Masse cross Cambridge Street and enter Chuck's Submarine Sandwich Shop. While Masse remained in the sandwich shop, Waterhouse handed Fencer a bag containing a white powder that appeared to be cocaine (the substance later field tested positive for cocaine). Fencer thereupon gave the arrest signal, and agents Boeri and Reilly got out of the car from which they had been watching Masse and moved to the doorway of the sandwich shop, where they waited.

When Masse came out of the shop, the two agents approached him. According to Boeri's testimony at the suppression hearing prior to Masse's trial,[1] the agents immediately identified themselves and said to Masse, "we are conducting a drug investigation. Do you mind talking to us?" Masse agreed, and the agents asked whether he would accompany them to the opposite side of Cambridge Street. Masse ac-

quiesced.[2] Agent Boeri testified that once Reilly, Masse and he crossed the street, events unfolded as follows:

[O]ne of us, Reilly or I—I think I may have said it—"How did you get here?" He says, "My car." I said, "What kind of car do you have?" He tells us a black Le Mans, so I said, "Where did you park it?" and he motions, he says, "Up the street," and he is motioning up Cambridge Street away from where the car had originally been on Blossom Street.

So I say to him, I said, "A black Le Mans?" I said "I just saw you get out of a white Grand Prix," at which point in time there was no further conversation, and we advised him, either Reilly or I, we said, "You are under arrest for violation of the federal narcotic laws." I then verbally advised him per the Miranda warnings of his rights.

After handcuffing Masse and placing him in the back seat of their car, the agents once again gave Masse *Miranda* warnings.

On the way to the police station, and after the second reading of the *Miranda* warnings, Masse explained to the agents his connection with Waterhouse and the drug deal. He claimed that he had been at home sleeping when he got a call from "these guys" to give them a ride to the Holiday Inn, a service for which he was to be compensated. When asked whether he knew the purpose of the trip to the hotel, Masse admitted to knowing that a "coke deal" was to occur.

At the end of the bail hearing the next day, November 7, Masse and agents Fencer, Boeri and Reilly were standing in the rear of the courtroom when, according to Fencer's testimony at the suppression hearing, Masse stated, "I had nothing to do

---

**1.** As explained below, from November 7–9 Masse made four separate sets of incriminating statements to DEA agents. On appeal, he contends that these statements should have been suppressed because they were obtained either before the agents gave *Miranda* warnings or as fruit of the resulting poisonous tree. In evaluating the admissibility of these statements, and in describing the factual background of this appeal, we rely exclusively on the record of the pretrial suppression hearing. *See* pages 808–09, *infra.*

**2.** At the suppression hearing, agent Boeri explained that he and Reilly wished to conduct the conversation with Masse on the other side of Cambridge Street for security reasons. The agents did not know how Masse, apparently a fairly large man, would react to questioning. By crossing Cambridge Street, the agents would be near additional plain-clothes agents involved in the operation.

with this. I don't know what's going on. You guys know I don't know anything, what's going on." After Fencer responded with "Have you talked on the telephone at all in the last six months," Masse allegedly exclaimed, "Well, then, I guess you guys do know what's going on."

A similar conversation occurred on November 9, after Masse had been released on bail and had returned to DEA headquarters to retrieve his car and $697 seized from him at the time of his arrest. While at the headquarters, Masse indicated to agents Fencer and Boeri that he had provided the cocaine to Waterhouse (although also emphasizing that he was just a middleman).[3] Boeri testified at the suppression hearing that, instead of letting Masse continue to incriminate himself, the agents suggested, "Well, ... why don't you get in touch with your attorney and come back and talk with us if you've got something further to discuss about this." There is no evidence of any further incriminating conversation between Masse and any DEA agent.

On November 20, 1984, a federal grand jury sitting in the District of Massachusetts returned a one-count indictment against Masse and Waterhouse. A two-count superseding indictment was returned on November 29. Count 1 of the superseding indictment charged the defendants with conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (1982). Count 2 alleged that the defendants "did knowingly and intentionally possess with intent to distribute, and did distribute, a quantity of cocaine," in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982). Prior to trial, defendant Waterhouse pleaded guilty.

Masse subsequently moved for the suppression of "any statements" obtained by the DEA on either November 7 or November 9. His motion asserted, without expla-

nation, that any such statement was "the product of improper interrogation in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution. *Miranda v. Arizona.*" On February 25–26, 1985, the district court conducted a hearing on the motion, which it ultimately rejected in an opinion delivered from the bench on February 26. Trial commenced on March 15, 1985 and concluded on March 19, when the jury was instructed. At the request of defense counsel, Count 2 was bifurcated into two charges: (1) possession with intent to distribute cocaine, and (2) distribution of cocaine. On March 21, 1985, the jury returned a verdict of guilty on that part of Count 2 alleging distribution of cocaine, while acquitting Masse of all other charges.

## II. SUPPRESSION RULING

Masse contends that the district court erred in refusing to suppress the various incriminating statements he made at different times to DEA agents. His initial statements were to agents Boeri and Reilly concerning the location, make and color of his car. They followed the confrontation outside Chuck's Submarine Sandwich Shop on Cambridge Street. Masse says a custodial situation then existed, requiring the immediate giving of *Miranda* warnings, and rendering the agents' failure to do so here fatal to the later use of those statements. Because of this initial error, Masse also asks for suppression of his later statements—his remarks on the way to the police station following his arrest, at the close of his bail hearing the next day, and at DEA headquarters on November 9. While *Miranda* warnings preceded all of these, Masse wants them excluded as fruit of the poisonous tree.

In reviewing the court's refusal to suppress, we look only to the record created at the suppression hearing. We recognize

---

**3.** When asked at the suppression hearing about the content of Masse's November 9 statements, Agent Fencer testified that

> He stated to us, myself and Special Agent Boeri, who was there, that he realized that we knew everything that was going on, ... that we knew he wasn't the big kingpin in this

operation; that he had received the cocaine from a female; ... and that she had gotten it from another male who lives in Dorchester. Fencer offered substantially the same testimony at trial. Agent Boeri, at both the suppression hearing and the trial, corroborated Fencer's account of Masse's November 9 comments.

that Masse did not choose to testify until the trial itself and that, when he did so, he told a somewhat different story concerning the events surrounding his arrest than had the agents at the suppression hearing. Masse did not, however, ask the district court to reopen its prior suppression ruling, and we see no occasion for this court to look beyond the record at the suppression hearing in determining whether that ruling, based on evidence from that hearing, was properly founded.[4]

We see no merit in Masse's argument that the statements he made to agents Boeri and Reilly prior to his arrest should have been suppressed because the agents had not given *Miranda* warnings. Masse was not then in custody. *See, e.g., Berkemer v. McCarty,* 468 U.S. 420, 434, 104 S.Ct. 3138, 3147, 82 L.Ed.2d 317 (1984) (defendant in a custodial situation must be afforded *Miranda* warnings before being questioned). The agents' request that Masse talk to them did not create a custodial situation. As the Supreme Court stated in *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977),

> [a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.

*Accord Podlaski v. Butterworth,* 677 F.2d 8, 9 (1st Cir.1982).

▮▮▮ A custodial situation necessitating *Miranda* warnings arises only where "there is 'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v.*

*Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) *(quoting Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714). *Accord United States v. Quinn,* 815 F.2d 153, 160 (1st Cir.1987); *Fisher v. Scafati,* 439 F.2d 307, 310 (1st Cir.) ("[c]ustody, in the *Miranda* sense, must require at least some objective manifestation that the defendant was 'deprived of his freedom of action in [a] significant way' "), *cert. denied,* 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971). Whether a restraint of freedom triggers *Miranda* must be determined by objective standards.[5] *See, e.g., Podlaski,* 677 F.2d at 9; *Borodine v. Douzanis,* 592 F.2d 1202, 1206 (1st Cir.1979). Although no mechanical test exists, in *United States v. Streifel,* 781 F.2d 953, 961 n. 13 (1st Cir.1986), we stated that the factors to be considered include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."

▮▮▮ Here, the agents' prearrest questioning of Masse took place shortly after 1:30 in the afternoon, on the public sidewalks bordering Cambridge Street, a major thoroughfare in downtown Boston. The agents were not in uniform, identified themselves immediately upon approaching Masse, and at no time prior to the arrest engaged in or threatened physical coercion. The agents' questioning of Masse was brief; its purpose was to dispel or to confirm their suspicions of wrongdoing. To be sure, after Masse, Reilly and Boeri had crossed Cambridge Street from the sandwich shop, the questioning occurred in proximity to other plain-clothes agents. But the court could reasonably have be-

---

4. Findings by the district court in a suppression hearing are binding on appeal unless clearly erroneous. *United States v. Baldacchino,* 762 F.2d 170, 175 (1st Cir.1985); *United States v. Holmes,* 632 F.2d 167, 169 (1st Cir.1980). We will uphold the district court's denial of a motion to suppress if any reasonable view of the evidence supports it. *United States v. Veillette,* 778 F.2d 899, 902 (1st Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986);

*United States v. Payton,* 615 F.2d 922, 923 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).

5. Thus, the question is not whether Masse subjectively felt coerced by the officers' conduct but whether a reasonable man in his position would have so felt.

lieved that these additional agents were busy with other aspects of the investigation and did not actively participate in Masse's questioning. This record provides adequate support for the district court's ruling that, prior to his arrest, Masse was not in a custodial situation requiring *Miranda* warnings. *See Quinn*, at 161; *Streifel*, 781 F.2d at 961; *Podlaski*, 677 F.2d at 9–10; *Borodine*, 592 F.2d at 1205–08. The court, therefore, committed no reversible error in refusing to suppress Masse's prearrest statements.

■ As no reason existed to suppress Masse's first set of statements, there was no primary illegality to taint his subsequent statements. Accordingly, we reject Masse's argument that his subsequent statements should have been suppressed as fruit of the poisonous tree.[6]

## III. COCONSPIRATOR STATEMENTS

At trial, the government sought to introduce statements Joseph Waterhouse made to DEA agent Fencer, in the latter's undercover capacity, on two different occasions. The first of these were the November 6 telephone conversations, tape recorded by the DEA, in which Fencer and Waterhouse planned the details and timing of the next day's drug deal. The second statement, occurring on the day of the deal, was in a face-to-face interchange between Fencer and Waterhouse. After Masse had walked past Fencer into the hotel lobby, Fencer had asked Waterhouse "who the other individual was that got out of the car with him," referring to Masse. Waterhouse purportedly responded, "the source for the cocaine."

In opposing admission of the November 6 telephone conversation, Masse insisted that the government had produced no evidence that he was a member of the conspiracy *on that date.* Accordingly, Masse argued, the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), did not apply.[7] By contrast, he argued that Waterhouse's November 7 remark was inadmissible because not in furtherance of the conspiracy. The district court rejected both assertions, finding that (1) Masse was more likely than not a member of the conspiracy on November 6, and (2) Waterhouse's November 7 statement was in furtherance of the conspiracy. On appeal, Masse challenges both determinations.[8]

### A. *November 6 Telephone Conversations*

Masse's argument that coconspirator statements made prior to the time he joined the conspiracy are inadmissible is based on dicta from our *Petrozziello* opinion which suggests that both the defendant and de-

---

6. Even had a custodial situation existed so as to require *Miranda* warnings, suppression of Masse's postarrest statements would not have been required. These occurred only after he had twice been read his *Miranda* rights. The Supreme Court stated in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222 (1985),

> [i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of ·any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Accord Bryant v. Vose*, 785 F.2d 364, 366–67 (1st Cir.1986). Masse does not claim on appeal that his postarrest statements were involuntary or unknowing. They were, therefore, admissible quite apart from whether prearrest *Miranda* warnings should have been given.

7. Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.

8. To the extent that Masse contends that his acquittal on the conspiracy count demonstrates the district court's error in ruling that he was a member of the conspiracy, we reject the argument. One reason for our doing so is the jury could convict Masse only if the government proved its case beyond a reasonable doubt. By contrast, in deciding whether Masse was a member of the conspiracy for the purposes of Fed.R. Evid. 801(d)(2)(E), the district court operated under a "more likely than not" standard. *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977).

clarant must be members of the conspiracy at the time the hearsay statement was made. 548 F.2d 20, 23 (1st Cir.1977).

Here there was more than ample proof that Masse was a member of the conspiracy on *November 7*, the day of the drug deal. Masse admitted to being a source of the cocaine; he appeared, along with Waterhouse, at the Holiday Inn on November 7; and he lied to agents Boeri and Reilly when asked about the location, color and make of his car. Masse insists, however, that there was insufficient evidence that he was a member of the conspiracy *at the time of the November 6 phone conversations* between Waterhouse and Fencer.

■ This argument is without merit. This court recently held that the mentioned dicta from *Petrozziello* is *not* to be read as announcing a new rule that a coconspirator's statement is admissible only if the defendant is shown to have belonged to the conspiracy at the time the statement was made. *United States v. Baines*, 812 F.2d 41, 42 (1st Cir.1987). *See also United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Once found to be a member of a conspiracy, a defendant is subject to proof of the prior acts and comments of his coconspirators. A statement made by a coconspirator, if in furtherance of the conspiracy, is therefore admissible against the defendant even if made prior to the defendant's involvement in the conspiracy. Here, given the evidence demonstrating that, by November 7 at least, Masse was a member of the conspiracy to sell cocaine, the district court properly admitted into evidence the three earlier November 6 telephone conversations between Waterhouse and Fencer.[9]

### B.  *November 7 Statement*

Masse advances two arguments why the district court erred by admitting Waterhouse's statement to Fencer that Masse was "the source for the cocaine." First, he says "the evidence does not establish by a

preponderance that Appellant was a member of the conspiracy with Waterhouse." For reasons already stated, we find this contention groundless.

■ Masse's second position is that the statement was not made in furtherance of the conspiracy. This claim likewise has no merit. In the case at bar, Waterhouse's statement was made prior both to the completion of the drug deal and to his arrest. *Compare United States v. Palow*, 777 F.2d 52, 56–57 (1st Cir.1985) (postarrest statement inadmissible under Fed.R.Evid. 801(d)(2)(E)), *cert. denied*, — U.S. —, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986). In *United States v. Fahey*, 769 F.2d 829, 839 (1st Cir.1985), we stated that a coconspirator's statement satisfies Rule 801(d)(2)(E)'s "in furtherance" requirement if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." When Fencer inquired into Masse's identity, he made it clear that he was nervous and reluctant to meet any additional people. Waterhouse could have believed that had he given an unsatisfactory answer, Fencer would have become skittish and refused to consummate the transaction. Thus, his identification of Masse as "the source" tended to further the goals of the conspiracy, *i.e.*, selling the cocaine. *See Fahey*, 769 F.2d at 838–39; *United States v. Davis*, 623 F.2d 188, 191–92 (1st Cir.1980); *United States v. Klein*, 522 F.2d 296, 301 (1st Cir.1975). *See also United States v. Anderson*, 642 F.2d 281, 285 (9th Cir.1981) (identification of defendant as "source" held to be in furtherance of the conspiracy); *United States v. Lambros*, 564 F.2d 26, 30 (8th Cir.1977) (same), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978).

### IV.  WILLFUL BLINDNESS INSTRUCTION

Masse objected to the district court's instruction to the jury on the theory of willful blindness. He contended, and continues to argue on appeal, that the record was devoid of any evidence that he intentionally

---

9. Because of our holding, we do not reach the question of whether the record supports the district court's finding that Masse was more likely than not a member of the conspiracy on November 6.

avoided knowledge of wrongdoing. We disagree.

■ In *United States v. Picciandra*, 788 F.2d 39, 41 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986), we said that a willful blindness instruction is proper if a defendant claims a lack of knowledge, the facts suggest a conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge. *Accord United States v. Martin*, 815 F.2d 818, 823 (1st Cir.1987); *United States v. Krowen*, 809 F.2d 144, 148 (1st Cir. 1987); *United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir.1986).

■ The first and third prongs of *Picciandra* were met here: Masse denied knowledge of the occurrence of a drug deal, and the instruction did not mandate an inference of knowledge. The remaining issue is whether the record contains sufficient evidence of a *conscious* course of *deliberate* ignorance, *i.e.*, of purposeful blinding while knowing that a crime was likely in progress which Masse was facilitating.

If, as Masse insisted, he lacked actual knowledge of all the details of the drug dealing, we find ample evidence from which a jury could have found that he knew a narcotics deal was likely in progress. It is relevant that the evidence strongly indicated that Masse was a person who would be particularly capable of detecting the signs of a cocaine deal. *See Martin*, 815 F.2d at 823. He was an acknowledged cocaine user. Moreover, evidence indicated that he was involved in the trafficking of cocaine, not just its casual use. At the time of Masse's November 7 arrest, DEA agents discovered in his car an Ohaus triple beam balance scale and baking powder, both of which the district court found to be tools commonly used by drug sellers. (Baking powder is mixed with pure cocaine to dilute the product and increase its yield.)

Masse testified that he had not known Waterhouse prior to November 7, the day of the aborted drug deal. He claimed to be driving Waterhouse to the Holiday Inn as a favor to a friend—not knowing that Waterhouse intended to engage in a drug transaction or that he (Masse) would be facilitating such a transaction. En route to the hotel, however, the third person in the car, identified at trial as Phil Frontiera, turned to Waterhouse, gave him a package, and remarked "get 10 for it." Frontiera's comment was the subject of the following colloquy at trial, during Masse's cross-examination:

Q. What did you think he meant by that?

A. I didn't know what he meant by it exactly. I assumed something was going on right then and there. I did assume something was going on.

Q. Did you ask him?

A. No, I didn't. I was eating a submarine sandwich and I was almost at the spot anyway. No, I just didn't ask. I didn't say anything to him. I just continued to eat and drive.

Masse's testimony, if believed, would suggest a paradigm case of willful blindness. As we stated in *United States v. Rothrock*, "[t]he purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing [in actions they are facilitating], nonetheless consciously refuse to take basic investigatory steps." 809 F.2d at 323. *Accord United States v. Martin*, 815 F.2d at 823.

Given this evidence (and more not here recounted), we find no error in the district court's giving of an instruction on willful blindness.

## V. AUTHENTICATION OF EVIDENCE

At trial, the government attempted to put into evidence a plastic bag containing a straw, razor blade, piece of paper that read "13 POW/ROCK 15," and a "nine of hearts" playing card, each of which agents Boeri and Reilly purportedly found on Masse's body at the time of his arrest. Masse objected, claiming that the government failed to satisfy Fed.R.Evid. 901(a)'s

authentication requirement.[10] In particular, he pointed to the trial testimony of Boeri and Reilly in which the agents could not recall which of them had taken the items or their location on Masse's body. The district court denied Masse's objection, a decision we review for abuse of discretion. *United States v. Drougas*, 748 F.2d 8, 24 (1st Cir.1984); *United States v. Sorrentino*, 726 F.2d 876, 886 (1st Cir.1984).

■ Here, given the agents' testimony that (1) the items were discovered as a result of their search of Masse; (2) the objects were "in substantially the same condition as they were on November 7, 1984," the day of the arrest; and (3) they followed standard procedure in performing the search and placing the seized goods in a plastic bag, the district court did not abuse its discretion in denying Masse's objection. *See, e.g., United States v. Mendel*, 746 F.2d 155, 167 (2d Cir.1984) ("the prosecution need only prove a rational basis from which to conclude that the exhibit did, in fact, belong to the appellants"), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *United States v. Luna*, 585 F.2d 1, 6 (1st Cir.) ("[t]he trial judge [is] entitled to rely on a presumption of official regularity"), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). In the words of Fed.R.Evid. 901(a), the court could fairly presume that the "matter in question [was] what its proponent claim[ed]" it to be.

## VI. EVIDENCE OF MASSE'S SUBSEQUENT POSSESSION OF COCAINE

■ While on bail for the charges underlying this appeal, Masse was found in possession of 1½ grams of cocaine. Below, when the government attempted to elicit this information from Masse on cross-examination, defense counsel objected, claim-

ing that such testimony lacked any probative value. The district court overruled the objection on the ground that the evidence tended to show that Masse had access to drugs and a drug habit that might require support—inferences the district court found relevant under Fed.R.Evid. 404(b)[11] to prove opportunity and motive. The district court did not abuse its discretion in drawing this conclusion. *See United States v. Mazza*, 792 F.2d 1210, 1222–23 (1st Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987); *United States v. Johnston*, 784 F.2d 416, 423 n. 11 (1st Cir.1986); *United States v. Kadouh*, 768 F.2d 20, 21 (1st Cir.1985); *United States v. Medina*, 761 F.2d 12, 15 (1st Cir.1985); *United States v. Morris*, 700 F.2d 427, 431 (1st Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983).

*Affirmed.*

---

**10.** Fed.R.Evid. 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

**11.** Fed.R.Evid. 404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.