94 F.3d 640
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES of America, Appellee,
v.
Kenneth SCHIAVO, Defendant, Appellant.
 No. 95-1437.
 United States Court of Appeals, First Circuit.
 Aug. 19, 1996.
 
 Ronald Kovner with whom Paul F. Markham was on brief for appellant.
 Dina Michael Chaitowitz, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.
 Before LYNCH, Circuit Judge, and COFFIN, Senior Circuit Judge, and CUMMINGS,* Circuit Judge.
 COFFIN, Senior Circuit Judge.
 
 
 1
 Defendant Kenneth Schiavo appeals his conviction for conspiring to possess, and possessing, cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 846. After careful consideration, we affirm.
 
 I. BACKGROUND
 
 2
 We briefly sketch the facts underlying this case, as the jury might have found them, saving detail for our analysis of specific claims. Defendant Schiavo was involved in a cocaine distribution scheme with Howard Winter and Gennaro Farina that operated in Massachusetts for an extended period of time in the early 1990s. Winter was the target of a joint investigation into drug trafficking conducted during this time by the Drug Enforcement Agency (DEA) and the Massachusetts State Police. With assistance from a confidential informant (CI), the law enforcement agencies developed extensive evidence through direct and electronic surveillance.
 
 
 3
 The CI, who had been a regular customer of Winter's before going to work for the government in April 1991, reported that in the spring of 1990 Winter had disclosed to him that "Kenny ... was the supplier" of the cocaine that the CI had been purchasing. From May to November 1991, the CI engaged in five controlled buys through Winter. A pattern emerged from these transactions: after Winter discussed a potential sale with the CI, he called or met Schiavo, and then reported pertinent information back to the CI.
 
 
 4
 The final transaction provided the most direct link between Schiavo and the conspiracy. On November 4, 1991, the CI gave Winter a New Balance bag containing $9,000 in identifiable bills as partial payment for cocaine delivered November 1. Soon thereafter, Winter and Schiavo met at a restaurant in Chelsea. Schiavo was followed from there and, in accordance with a prearranged plan, stopped by Trooper Thomas Duffy. Duffy approached Schiavo, observed a bulge in his jacket, frisked him for weapons and discovered the New Balance bag. The officer seized the money in the bag and additional cash carried by Schiavo--a total of $12,500--but did not arrest him.
 
 
 5
 In January 1992, a grand jury returned a multiple count indictment against Schiavo, Winter and Farina, charging participation in a drug conspiracy from May 1991 to January 5, 1992, and five substantive counts of possessing and distributing cocaine. Schiavo was charged on three of the substantive counts. Following his arrest, he successfully moved to suppress the bag of money.[1]
 
 
 6
 On September 1, 1994, shortly before trial was scheduled to begin, Schiavo was charged in a superseding indictment that pushed the conspiracy's start date back eighteen months to December 1989 and added two substantive counts. Schiavo filed a motion to dismiss the superseding indictment, which was denied. The trial eventually began on November 14, 1994. The jury returned guilty verdicts on the conspiracy charge and the three substantive counts originally charged.
 
 
 7
 Schiavo raises six issues on appeal: (1) a double jeopardy violation; (2) improper admission of testimony about the stop and frisk on November 4, 1992; (3) insufficient evidence that he participated in a conspiracy spanning the term charged in the superseding indictment; (4) improper admission of the CI's reported statement from Winter that Schiavo was the cocaine supplier; (5) prosecutorial vindictiveness; and (6) a violation of the Speedy Trial Act. We discuss each in turn.
 
 II. DISCUSSION
 A. Double Jeopardy
 
 8
 Pursuant to 21 U.S.C. § 881(a)(6), the DEA obtained civil forfeiture of $5,090 of Schiavo's money.[2] Schiavo claims that his criminal conviction following this forfeiture constitutes a second punishment for a single offense, and thus violates the constitutional proscription of double jeopardy. This argument was firmly rejected by United States v. Ursery, 116 S.Ct. 2135, 2149 (1996), where the Supreme Court held, inter alia, that an in rem civil forfeiture under § 881(a)(6) is "neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause."
 
 B. Testimony Relating to the Stop and Frisk
 
 9
 On Schiavo's original motion to suppress, the court ruled that Duffy's search reached its constitutional limit at the completion of the initial pat frisk, which confirmed that Schiavo was not carrying any weapons. Accordingly, the court suppressed all items seized after this point, in particular, the bag of currency.
 
 
 10
 At trial, Duffy recounted his stop-and-frisk encounter with Schiavo.
 
 
 11
 Q. And did you approach Mr. Schiavo?
 
 
 12
 A. Yes, I did.
 
 
 13
 Q. And did you notice anything upon approaching Mr. Schiavo after you pulled him over?
 
 
 14
 A. I did.
 
 
 15
 Q. What did you observe?
 
 
 16
 A. I noticed the large bulge in his left breast area.
 
 
 17
 Q. After you noticed this bulge, what did you do?
 
 
 18
 A. I did an initial pat frisk of that area and I asked if that was all him.
 
 
 19
 Q. And how did Mr. Schiavo respond when you pat frisked him and asked him if it was all him?
 
 
 20
 A. He responded "Mostly."
 
 
 21
 Q. Did you make any other comments concerning the bulge in his jacket at that point in time?
 
 
 22
 A. Yes.
 
 
 23
 Q. What did you say?
 
 
 24
 A. I asked him more than once if he had a weapon.
 
 
 25
 Q. Did you ask him anything else?
 
 
 26
 A. As I was touching that area of his chest, I asked him what it was. He replied, "It's a bag." I said, "It's an awful big bulge for a bag." He responded, "It's big."
 
 
 27
 Schiavo complains that it was error to allow any testimony regarding the stop, especially testimony that related to the suppressed bag of currency. For a number of reasons, we disagree.
 
 
 28
 Most significantly, Schiavo's motion to suppress referenced only "items seized," not statements made. This distinction was confirmed at the suppression hearing, where Schiavo's counsel made clear that defendant's statements were not at issue.[3] On November 14, 1994, the first day of trial, Schiavo filed a motion in limine requesting exclusion of "any evidence concerning the 'serialized' currency," but it was not until November 21, 1994, that Schiavo filed a motion to suppress any and all statements made by him on November 4, 1991. The court properly denied the motion as untimely, see Fed.R.Crim.P. 12(b)(3), and without merit, but nonetheless suppressed statements made after the illegal seizure of the bag of currency.
 
 
 29
 We think the court's reasoning, that the completion of the pat frisk separated admissible from inadmissible statements, is unassailable. The frisk antedated the unconstitutional conduct; accordingly, information derived during it cannot be considered fruit of the poisonous tree. See United States v. Crews, 445 U.S. 463, 470-71 (1980). Moreover, the court's assessment of where the pat frisk ended was cautious and to the defendant's benefit. The statement "It's big" fell well within its span.
 
 
 30
 Schiavo alternatively seeks exclusion of the statements based on the absence of Miranda warnings. This contention was not raised in any manner below and is waived.[4] PH0H C. Claims Based on Length of the Conspiracy
 
 
 31
 Schiavo contends that the government's evidence failed to link him to a conspiracy lasting from December 1989 to January 1992. He therefore argues that the jury's guilty verdict on the conspiracy charge must be vacated and that the coconspirator statement made in 1990 was improperly admitted. We think it helpful to set forth in detail the evidence presented at trial relevant to the conspiracy charge before analyzing his claims of error.
 
 The 1990 Transactions
 
 32
 The CI detailed seven transactions that took place between January and November 1990, before his involvement with the government. The CI arranged these deals through Winter, who then, usually accompanied by Farina, delivered the cocaine, though the drugs were once delivered by Farina and another time by Winter's son. Without exception, the CI received the cocaine on credit, paying Winter within a few days.
 
 
 33
 The CI learned of Schiavo's participation during the fifth transaction, which occurred in May or June of 1990. On that occasion, according to his testimony, the CI drove with Winter to the Assembly Mall parking lot in Somerville, Massachusetts. Schiavo arrived soon thereafter and parked nearby. Winter approached Schiavo, received a bag from him, returned and handed the bag to the CI. The bag contained one kilogram of cocaine. The CI testified that he then inquired into the deliverer's identity: "I asked Howie who this gentleman was and he said it was Kenny and that he was the supplier for the products."
 
 The CI's Cessation of Activities
 
 34
 In November 1990, Winter advised the CI not to use telephones because of "a 3T investigation."[5] Upon hearing this, the CI terminated his business with Winter. The conspirators' awareness of the DEA investigation was further demonstrated by a phone conversation intercepted on November 22, in which Schiavo's son indicated to a friend that the police were listening. Later that same day, Schiavo and Winter met briefly on a street corner in Medford.
 
 
 35
 The CI could not provide information about the period between November 1990 and May 1991. Nonetheless, NYNEX phone records established that a number of calls were placed between the residences of Schiavo and Winter during this time.[6]
 
 The 1991 Transactions
 
 36
 The 1991 controlled transactions were documented by personal and electronic surveillance. The CI reinitiated contact with Winter on May 20, 1991, and met with him the next day. On May 22, Winter and Farina delivered one kilogram of cocaine to the CI; on June 13, 1991, they delivered two.[7] In each case, payment was rendered the following day. At significant points during each deal--on May 22, near the time that the CI called Winter to arrange for payment; on June 12, following the CI's order for two kilograms; and on June 14, following the CI's payment to Winter--calls were placed from Winter's home to Schiavo's.
 
 
 37
 On the morning of August 1, the CI picked up Winter and ordered two kilograms of cocaine. After stopping to make a phone call, Winter informed the CI that, "He's gonna meet me." They proceeded to a Caldor's parking lot in Brighton, where Schiavo soon arrived. After meeting briefly with Schiavo, Winter returned to the car and told the CI, that "[We're] gonna meet him at 12 o'clock." Schiavo returned to Somerville, and parked his car near Farina's. At approximately 12:00 p.m., Farina delivered one kilogram of cocaine to the CI.
 
 
 38
 On August 2, the CI paid Winter and asked about the other kilogram of cocaine. Winter responded "let me call him up," and then placed a call to Schiavo's home. He then advised the CI that "he's still trying to--to get that other one," and that "if he can get it out there, whatever time, I'll just give you the time and that kid[8] will be there." The next day, Farina delivered a kilogram of cocaine to the CI. The CI paid Winter for this cocaine on August 8. On August 9, Winter met with Schiavo for several minutes in the parking lot of the Sheraton Tara hotel in Framingham.
 
 
 39
 On October 31, the CI, while driving with Winter, ordered another kilogram of cocaine. Winter placed a phone call to Schiavo's residence and arranged to meet him at a Dunkin Donuts. Winter and Schiavo met briefly, and Winter informed the CI that he could pick up the kilogram later in the day. Due to a misunderstanding--the CI apparently went to the wrong location--the cocaine was not delivered until the following morning, when Winter brought it to the CI's home.
 
 
 40
 As discussed above, the CI gave Winter $9,000 in a bag on November 4. A short time later, Winter and Schiavo arrived separately at the Chandlery Restaurant in Chelsea. Upon departing and being stopped and frisked by Trooper Duffy, Schiavo stated that he was carrying a big bag. On November 6, the CI paid Winter the balance owed on the one kilogram.
 
 1. The Conspiracy Verdict
 
 41
 Schiavo contends that the evidence failed to establish the single conspiracy charged, and suggests that, at best, only multiple conspiracies were proved. We review the jury's determination for evidentiary sufficiency, United States v. Wihbey, 75 F.3d 761, 774 (1st Cir.1996), and affirm if a rational jury could have found guilt beyond a reasonable doubt. United States v. Taylor, 54 F.3d 967, 974 (1st Cir.1995).
 
 
 42
 The controlled nature of the 1991 deals, conducted under extensive surveillance, yielded substantial evidence of Schiavo's involvement in the cocaine conspiracy. For example, Winter consistently called, or arranged to meet, Schiavo whenever the CI ordered or paid for cocaine. This indicated that Schiavo played a major role in the operation. Moreover, the jury could reasonably infer, based on Schiavo's comments to Trooper Duffy, that the bag on his person was the bag of money delivered by the CI to Winter.
 
 
 43
 Notwithstanding Schiavo's protestations, there was significant evidence that this conspiracy commenced many months earlier. First, the particulars of the 1991 transactions were consistent with the 1990 ones: the CI ordered cocaine from Winter, received it from Winter and/or Farina, and paid Winter for it within a few days. Both series of transactions involved the same people, contemplated the same ends, and used the same means to reach those ends, all of which signify one continuous conspiracy. See United States v. David, 940 F.2d 722, 734 (1st Cir.1991). Even more compelling, the CI observed Schiavo deliver cocaine to Winter in the spring of 1990, at which time Winter identified Schiavo as the supplier of the drugs.[9]
 
 
 44
 Schiavo's essential argument is that there was a lapse of six months in which the government failed to identify a substantive transaction. We do not think that a lapse of time per se transforms a single conspiracy into multiple conspiracies. See United States v. Williamson, 53 F.3d 1500, 1513 & n. 6 (10th Cir.1995) (citing cases from other circuits); United States v. Maldanado-Rivera, 922 F.2d 934, 963 (2d Cir.1990). There is no indication whatsoever that Schiavo withdrew from the conspiracy. Indeed, phone records indicate that Schiavo and Winter regularly communicated during the supposed period of inactivity. Moreover, based on the events in November 1990--Winter's comment to the CI, Schiavo's son's intercepted conversation, and the meeting between Winter and Schiavo--it is reasonable to infer that Schiavo and Winter were well aware of the increased federal surveillance, and resolved to be more cautious in their activities.
 
 
 45
 In short, the fact that there is no direct evidence of cocaine transactions from late November 1990 to late May 1991 does not negate the evidence of a continuing conspiracy. Accordingly, we find the evidence sufficient to support the verdict.[10]
 
 2. Admission of Winter's Statement
 
 46
 Schiavo complains of the court's admission of Winter's 1990 statement identifying him as "the supplier." The court allowed the remark as a statement made by a coconspirator under Fed.R.Evid. 801(d)(2)(E).[11] Schiavo contends that there was no evidence that Schiavo and Winter were coconspirators at the time. The court, based on a preponderance of the evidence, reached the opposite conclusion. We review its factual findings for clear error. United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir.1993).
 
 
 47
 The law in this area is well settled. "To invoke the [801(d)(2)(E) ] exception, a party who wants to introduce a particular statement must show by a preponderance of the evidence that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Flores-Rivera, 56 F.3d 319, 329 (1st Cir.1995) (internal quotation marks and citations omitted). This determination is the province of the court. United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir.1977).
 
 
 48
 During a conference near the end of trial, the court made explicit findings under Petrozziello, stating
 
 
 49
 I have to make that finding at the close of all the testimony[ ]--that Mr. Winter and Mr. Schiavo and Mr. Farina were members of the conspiracy at the time the statements were made and that the statements were made during the course of and in furtherance of the conspiracy. I do find that by a preponderance.[12]
 
 
 50
 Schiavo argues that there is no extrinsic evidence tying him to a conspiracy in 1990. See Sepulveda, 15 F.3d 1161, 1182 (1st Cir.1993). Our earlier discussion of evidentiary sufficiency disposes of this assertion. Given the relevant standard of proof--more likely than not--the evidence, absent Winter's statement, easily supports the court's finding that the statement was made during the course of a conspiracy involving Winter, Schiavo and Farina.
 
 
 51
 Nor can its finding that the statement was made in furtherance of the conspiracy be attacked. A statement furthers a conspiracy if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." United States v. Masse, 816 F.2d 805, 811 (1st Cir.1987) (internal quotation marks and citation omitted). Here, the identification of Schiavo to the CI, then a key participant in the drug distribution chain, clearly tended to further the goals of the conspiracy. See id. Winter's statement was properly admissible.
 
 D. Prosecutorial Vindictiveness
 
 52
 On September 19, 1994, Schiavo filed a pretrial motion to dismiss the superseding indictment asserting, inter alia, that the indictment was procured as a result of an abuse of the grand jury process. In particular, he alleged that the government convened the grand jury to shore up its weak case, violating the spirit of United States v. Doe, 455 F.2d 1270 (1st Cir.1972). After an evidentiary hearing, the motion was denied. Schiavo abandons the grand jury theory on appeal, in favor of an alternative claim that the superseding indictment was a product of vindictive prosecution. As this claim was not advanced below, we review for plain error. United States v. Santiago, 83 F.3d 20, 25 (1st Cir.1996); United States v. Whaley, 830 F.2d 1469, 1476-77 (7th Cir.1987) (vindictive prosecution claim).
 
 
 53
 A defendant may show vindictive prosecution by 1) producing evidence of actual vindictiveness sufficient to show a due process violation or 2) demonstrating that the circumstances show there is a sufficient "likelihood of vindictiveness" to warrant a presumption of vindictiveness. United States v. Marrapese, 826 F.2d 145, 147 (1st Cir.1987). Schiavo does not attempt to prove actual vindictiveness, but insists that the following facts give rise to the requisite presumption: 1) the superseding indictment was returned soon after the government lost its appeal on the suppression of the currency, 2) the indictment was not based on the discovery of new evidence, and 3) the government expected Schiavo to plead. Even assuming that a presumption of vindictiveness could arise from pretrial conduct--a scenario that is questionable in light of United States v. Goodwin, 457 U.S. 368, 381 (1982) ("There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting.")--these facts are deficient as a matter of law. The filing of a pretrial motion, regardless of its successful outcome, and the failure of plea negotiations are routine events unlikely to provoke a prosecutor to "seek to penalize and deter." See id. Schiavo falls far short of demonstrating a "likelihood of vindictiveness," and necessarily fails to establish plain error.
 
 E. Speedy Trial
 
 54
 Schiavo claims a violation of the Speedy Trial Act, 18 U.S.C. §§ 3161-74. Under the Act, trial must commence within 70 nonexcludable days following defendant's appearance before a judicial officer of the court. Id. § 3161(c)(1). On Schiavo's motion, the court determined that 578 of the 616 days between Schiavo's initial court appearance on March 8, 1993, and the start of his trial on November 14, 1994, were excludable, leaving 38 nonexcludable days to go on the speedy trial clock.[13]
 
 
 55
 Schiavo alleges that the court erred by excluding time attributable to 1) his motion for pretrial release, 2) his motion to reconsider pretrial release, 3) his motion for return of property, and 4) a one week continuance. We review the court's factual findings for clear error and its legal rulings de novo. United States v. Rodriguez, 63 F.3d 1159, 1162 (1st Cir.1995).
 
 
 56
 The Act excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). We think that "any pretrial motion" easily encompasses pretrial motions relating to pretrial release or detention, and have previously held as much. See United States v. Noone, 913 F.2d 20, 27 (1st Cir.1990) (pretrial detention). See also United States v. Lattany, 982 F.2d 866, 872 n. 6 (3d Cir.1992); United States v. Wirsing, 867 F.2d 1227, 1230-31 (9th Cir.1989). We add that the court, in accordance with 18 U.S.C. § 3161(h)(1)(J), properly allowed only 30 days exclusion after these motions were under advisement. See Rodriguez, 63 F.3d at 1163.
 
 
 57
 The motion for return of property was a collateral matter subsumed in the pretrial motions for release. It did not separately account for any time excluded, and so is inconsequential to Schiavo's claim. We need not address the continuance, which accounted for six excludable days. Even if exclusion were erroneous, there would still remain 26 nonexcludable days on the speedy trial clock.
 
 III. CONCLUSION
 
 58
 Having found no merit to Schiavo's claims, the judgment is Affirmed.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation
 
 
 [1]
 The suppression was affirmed by this court. 29 F.3d 6 (1st Cir.1994)
 
 
 [2]
 The DEA instituted separate forfeiture proceedings against the $3500 of non-governmental money seized on November 4, 1991 and the $1590 seized from Schiavo at the time of his arrest on March 5, 1993
 
 
 [3]
 The Court: So, in other words, there is no motion to suppress any statements that may or may not be made, we're just concerned with suppression of the money?
 Schiavo's Counsel: Correct, your Honor.
 
 
 [4]
 In any event, the statements were made during a lawful stop and frisk under Terry v. Ohio, 392 U.S. 1 (1968). See 29 F.3d at 9. Schiavo was not in custody at the time, and, therefore, Miranda warnings were not warranted. See United States v. Quinn, 815 F.2d 153, 160-61 (1st Cir.1987)
 
 
 [5]
 According to a DEA agent, 3T refers to electronic surveillance authorized pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522. From November to early December 1990, the government had wiretapped one telephone of Winter's and two telephones of Schiavo's
 
 
 [6]
 The phone records entered as exhibits at trial were not included in the appellate record. We accept the representations of the government at closing argument and in its brief as to what these records reflect about the number and timing of specific calls. The defendant's closing argument and brief indicate that there is no dispute as to the contents of these exhibits
 
 
 [7]
 These transactions served as the basis for the two counts of the superseding indictment for which Schiavo was found not guilty
 
 
 [8]
 Earlier in the conversation, Winter had referred to "that kid Gerry"--i.e., Farina
 
 
 [9]
 We explain the admissibility of this statement in the next section
 
 
 [10]
 Because the evidence supports the single conspiracy charged in the indictment, we need not address the issues of variance and prejudice that are common components of multiple conspiracy claims. See Wihbey, 75 F.3d at 774
 
 
 [11]
 Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay
 
 
 [12]
 We note that the judge's interpretation of the law was more favorable to Schiavo than required: a defendant is subject to proof of the comments of coconspirators made prior to his involvement in the conspiracy. United States v. Masse, 816 F.2d 805, 811 (1st Cir.1987)
 
 
 [13]
 This figure actually represented nonexcludable days that had already passed. There were, in fact, 32 days to go on the speedy trial clock