**UNITED STATES of America, Appellee,**

**v.**

**Jerril J. KROWEN,**
**Defendant, Appellant.**

**No. 86–1102.**

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1986.

Decided Jan. 14, 1987.

Ellen Y. Suni with whom Jack I. Zalkind, Boston, Mass., was on brief, for appellant.

Peter A. Mullin, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and COFFIN, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

On January 22, 1985, Jerril J. Krowen was indicted on 15 counts of mail fraud, 18 U.S.C. §§ 1341–1342 (1982). The indictments charged Krowen, an attorney, with knowingly participating in a scheme to defraud by submitting falsified bills to his clients' and other insurance companies. After an 18-day trial, the jury returned a verdict of guilty on each of the 15 counts. We affirm.

## I.

The events relevant to this appeal occurred in Massachusetts between 1975 and 1981. During this period, Massachusetts operated under a "no fault" automobile insurance system that required, among other things, each owner of a vehicle registered in the state to obtain "personal injury protection" (PIP). Under PIP coverage, the owner of the vehicle and certain other persons automatically recovered from their insurance company all "reasonable expenses" resulting from an automobile accident, up to a maximum of $2,000. See Mass.Gen.Laws ch. 90, § 34A (West Supp. 1986). The owner and other covered persons were prohibited from bringing a negligence action against those who allegedly caused their injuries unless their expenses exceeded $500 or the accident resulted in death, disfigurement, fracture, or loss of a "body member," sight, or hearing. Mass. Gen.Laws ch. 231, § 6D (1985).

In March of 1975, appellant Krowen established a law office in Boston, Massachusetts, styled "The Law Offices of Jerril Krowen." According to Bruce Garr, the only lawyer working with Krowen when the firm opened, about half the cases handled by the office involved motor vehicle accidents. Sometime during 1975 or 1976, Krowen began referring clients involved in such accidents to Dr. Rosenthal, a chiropractor, and Dr. Hershenow, an internist. Gradually, the volume of referrals grew to a substantial level. Dr. Rosenthal testified that from 1976 through 1980 Krowen sent to him between 300 and 400 patients. Dr. Hershenow acknowledged that over roughly that same period, Krowen referred approximately 450 patients to him, more than any other lawyer with whom he was doing business.

At trial, Rosenthal and Hershenow testified that they had devised a system by which to defraud various insurance companies of thousands of dollars in these accident cases. During the period that Krowen was referring patients to them, the doctors engaged in widespread falsification of bills, typically charging patients for visits that never occurred. For example, Dr. Hershenow testified to seeing Mario Bozza only one time although charging him for six visits. The Bozza case was not an isolated occurrence. Dr. Rosenthal said that he inflated the "vast majority" of bills relating to his treatment of Krowen's clients; Dr. Hershenow estimated that "approximately three quarters of the bills were fraudulent."

For obvious reasons, the doctors attempted to prevent their patients from seeing the bills. Rather than billing the patients directly, the doctors would send bills to Krowen (or to members of his law firm), who would then submit them to the relevant insurance company. When the claim was settled, Krowen, not the client, would use the proceeds received from the insurance company to pay the doctors.

Although Rosenthal and Hershenow benefited financially from the fraudulent scheme so, too, did Krowen. The doctors testified to having agreed with Krowen to pay Krowen a proportion of the insurance money they received for treating his

* Of the Fifth Circuit, sitting by designation.

clients.[1] Thus, the greater the total billings by the doctors, the more money Krowen personally would receive from them. At least as important, however, was the $500 expense predicate the no fault statute imposed on an injured party's ability to bring a tort suit. By artificially increasing medical expenses, the doctors inevitably pushed some patients' billings over the $500 threshold.[2] Given that a plaintiff may recover for pain and suffering in a tort suit, and given that Krowen's office charged between a 33½ and 38 percent contingent fee, exceeding the $500 minimum could be of great economic benefit to Krowen.

The primary issue before the jury was whether Krowen participated in the doctors' scheme *knowing* it to be fraudulent.[3] That he, in fact, performed acts which were integral to the fraud (such as referring clients to the doctors and submitting to the insurers the padded invoices and remitting the payments received to the doctors) was not seriously contested. Krowen argued, however, that the prosecution failed to prove that he knew the doctors' bills were systematically inflated. Thus, while his own acts had the effect of furthering the illegal scheme, they may have been done, according to the theory, innocently, without requisite guilty knowledge.

After an extensive trial and two days of deliberations, the jury found Krowen guilty on each of the 15 counts for which he was tried. On appeal, Krowen assigns various errors, none of which we find to merit a reversal.

## II.

■ Krowen argues that the district court erred in denying his motion for a judgment of acquittal. He contends that the prosecution did not present sufficient evidence, as a matter of law, for the jury to convict. The standards under which we analyze such a claim are well settled. "In reviewing the sufficiency of the evidence, we consider the evidence as a whole, taken in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found each defendant guilty beyond a reasonable doubt." *United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984); *see also United States v. Tierney*, 760 F.2d 382, 384 (1st Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Because

---

1. Krowen's share ranged from 25 percent to, in a few instances, as much as 75 percent. The payments apparently worked as follows: after Krowen received the insurance company's reimbursement for his client's medical expenses, he would tender to the doctors the full amount of their bill. Accompanying the bill, however, would be a notation indicating the amount Krowen wanted returned to him.

   Dr. Rosenthal estimated that over the course of their business relationship, he paid Krowen between $45,000 and $48,000. When asked why such payments were made, Rosenthal vacillated, at one point calling them Krowen's compensation for ensuring that the doctor received his share of the insurance proceeds, only later to deem them "kickbacks." By contrast, Dr. Hershenow consistently described the payments as kickbacks.

2. At trial, it was clear that both doctors knew of the significance of the $500 limit. Indeed, Dr. Hershenow testified that at their first meeting Krowen emphasized that "there had to be at least $500 worth of no fault bills before the client could sue for pain and suffering." Although there is no evidence that Krowen expressly told either doctor to inflate bills to surpass the $500 threshold, there was evidence that people at his law firm came close to making such a request. For example, William Kearns, a former insurance adjuster who began working at The Law Offices of Jerril Krowen shortly after it opened, sent the following letter to Dr. Rosenthal (referred to in the letter as Stu):

   > Stu, this is the person I discussed with you on 3/31/78. She now has 395 in medical bills. I need at least $105 to exceed the statute.

3. Neither doctor was entirely consistent as to whether Krowen knew of the fraudulent activities. Dr. Rosenthal admitted to testifying at the grand jury "that Mr. Krowen did in fact know of the scheme." At trial, although acknowledging that in specific instances Krowen was aware of discrepancies in a client's bills, he denied that Krowen was a member of the scheme or that Krowen ever asked him to falsify bills. Dr. Hershenow was apparently never expressly asked as to Krowen's knowledge; his testimony, however, contained mixed signals, in some places implying that Krowen knew of the fraud and elsewhere suggesting that he did not.

Krowen concedes that the only question is whether there was sufficient evidence of intent, we will limit our analysis to that issue.

After a careful review of the record, we hold that the government presented enough evidence of Krowen's knowing participation in the fraudulent scheme to warrant the district court's denying the motion for acquittal. There were a number of pieces of evidence from which guilty knowledge could be inferred. For example, Dr. Hershenow testified that Krowen asked him explicitly on at least one occasion to falsify a bill. Hershenow stated that during a phone conversation in April of 1977 Krowen "said he had a relative who had an injury and needed a medical report." Krowen then told Hershenow about his aunt, Harriet Weisman, whom Krowen claimed was injured at a hotel when a tray of dishes and china fell, causing a shard of glass to lacerate her foot. As a result of the telephone conversation and as a "favor" to Krowen, Hershenow mailed a report to Krowen claiming, without ever having seen Weisman, that he had treated Harriet Weisman for a mild inflammation and infection of the heel on her left foot, and that Weisman had been disabled for six weeks. Hershenow testified that all the information in the false report came directly from Krowen. It can be reasonably inferred from this evidence that Krowen knew that Hershenow was willing to fabricate a client's medical history and report,[4] since, if he had not known, he would not have asked him to do so then. Significantly, the conversation occurred early in Krowen's professional relationship with Hershenow; even if Krowen had not previously been sure of Hershenow's willingness to falsify, he certainly was aware thereafter.

Hershenow also testified to a conversation he had with Krowen in 1976 or early 1977 concerning the "Insurance Crime Prevention Index," a computer network established by the insurance companies to keep track of clients, attorneys, and doctors who are involved in automobile accident cases. According to Hershenow, Krowen explained how the Index worked and stated "that he had some control so that his name didn't appear in the computer." When asked whether Krowen described the nature of that control, Hershenow answered, "Just that he knew somebody there." The jury could have reasonably inferred from this testimony not only that Krowen knew that Hershenow had something to hide, but also that he himself was benefiting to such a degree as to warrant his actively helping Hershenow cover up.

Another piece of evidence suggesting that Krowen knew of the doctors' fraudulent scheme was Dr. Hershenow's testimony that he had advised Krowen in 1977 that his (Hershenow's) secretary "didn't want to type these bills anymore." (Hershenow later retracted testimony that he had termed the bills "phony" when speaking to Krowen, but the rest of his testimony stood.) That Hershenow's secretary did not want to type the bills any longer would have suggested that they gave her some cause for concern. Krowen's sole response was that Hershenow should handwrite the bills in the future. That Krowen did not inquire why she would not type the bills, or pursue the matter further, suggests that he knew or suspected why the secretary would not type the bills.

The government also produced evidence that at least nine episodes of overbilling by the doctors were actually brought directly to Krowen's attention by clients and employees. The most damning of these instances involved Debra Coull, who on August 16, 1976 was involved in an automobile accident. She went to Krowen, who referred her to Dr. Rosenthal. Although Dr. Rosenthal saw her very few times, perhaps only once or twice, on October 19, 1976 he billed her for 18 visits totalling $421 (six months later, Rosenthal billed her for an additional eight visits costing $156). In November 1976 Coull informed Bruce

---

4. Hershenow agreed on cross-examination that "Mr. Krowen asked you and you remember that he asked you to send in a phony bill and a phony report."

Garr, one of Krowen's associates, that Rosenthal's October 19 bill was greatly exaggerated. Garr immediately told Krowen, who instructed Garr to contact Rosenthal about the error.

At some point Krowen called Rosenthal to discuss the bill, in large part because Garr was threatening to resign as a result of the incident. Krowen dropped the inquiry once Rosenthal promised to investigate the cause of the error. A few days later Rosenthal called Krowen and told him that he "didn't understand what the problem was, but the problem was going to be straightened out with this file, that Deborah Coull would receive the treatment she was billed for." Despite the fact that Coull had been billed for a startling number of visits that never occurred, Krowen asked no further questions about Rosenthal's billing process, nor did he establish a system to monitor for future errors (such as checking the accuracy of the bills with the patients). Krowen instead submitted the bill to Coull's insurance company, even though he knew it recounted numerous fictitious visits, contenting himself with Rosenthal's claim that she would eventually receive the treatment for which she was billed.

The foregoing incidents must be considered along with other evidence some of which we refer to elsewhere in this opinion: *e.g.*, the sizeable "kickbacks" Krowen regularly received from the doctors; the fact that so many bills were fabricated (some of them showing treatment dates that preceded the patient's first visit to Krowen and referral to one of the doctors); Krowen's personal involvement in directing the mail coming into his office; the fact that he interviewed the clients personally and presumably knew something of their injuries; and the extent of the discrepancies in the bills. Cumulatively the evidence permits the inference that Krowen, beyond a reasonable doubt, knew of the fraud that was going on under his very eyes. We conclude that the district court properly denied Krowen's motion for acquittal.

### III.

At trial, after hearing extensive argument by counsel, the district court decided to instruct the jury on the theory of "willful blindness." On appeal, Krowen asserts that the court erred in finding that the government had produced sufficient evidence to justify its giving of the charge. He also contends that the instruction given was so vague and ambiguous as to pose an unacceptable risk of juror confusion. We shall address each claim in turn.

### A. *Appropriateness of the Instruction*

In *United States v. Picciandra*, 788 F.2d 39 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986), we held that a willful blindness instruction is proper if a defendant claims a lack of knowledge, the facts suggest a conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be understood as mandating an inference of knowledge. *Id.* at 46; *see also United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir.1986). Krowen argues that this formulation is incomplete in a number of respects. Most importantly, he urges that we explicitly adopt the Ninth Circuit's requirement that a willful blindness instruction be given only where the defendant has "an awareness of the high probability of the existence of the fact in question." *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir.), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).[5] We need not rule on this contention, for even under the *Jewell* standard, the district

---

**5.** Krowen also asserts that there are important substantive distinctions between willful blindness and conscious avoidance, although he can cite no cases in support of this position. He claims that "conscious avoidance" is nothing but a method by which to infer actual knowledge. By contrast, he suggests that "willful blindness" applies where a defendant, although lacking actual knowledge of the ultimate fact, deliberately ignored clear evidence pointing to that fact. Even if such a distinction exists, we do not see how it affects the instant appeal given our holding that the instruction, however it is labelled, was properly given under the standards articulated in *Picciandra*.

court did not err by giving a willful blindness instruction.

Krowen presents two main arguments in support of his position that the jury should not have been instructed on willful blindness. First, he claims that he was too busy and too far removed from the details of most cases to have been able to detect wrongdoing, especially in the absence of more client complaints about the doctors' services. Although Krowen admits that several instances of inflated bills were called to his attention (we count nine, *supra*), he claims that when put in context of the hundreds of cases he referred to the doctors over a four to five year span, these episodes hardly indicated a pattern of fraudulent activity.

However, the government's evidence was stronger than this argument allows. We find ample evidence from which a jury could conclude that Krowen was aware of a high probability that the doctors were padding the bills. Besides evidence already described, the government presented evidence indicating that Krowen retained an active supervisory role over all the cases coming into the firm. He regularly met with new clients; this provided him with the opportunity to observe and to discuss their physical condition. There was evidence he personally sorted through the incoming mail, determining to whom each piece—including the doctors' bills—should be delivered. Similarly, he personally signed the correspondence sending bills to the insurance companies and the checks paying the doctors when the claims were settled. Because nearly 50 percent of his clients had not received medical treatment when they came into his office, and the doctors admitted to markedly inflating the vast majority of their bills (often by backdating bills to reflect visits that predated the client's first contact with Krowen), it could be concluded that Krowen was aware of a high probability that the bills were inflated and—to the extent he did not take pains to ascertain the facts concerning a particular bill—this was only because he deliberately chose not to acquaint himself with them.

Certainly some of the facts of which Krowen became aware cried out for a thorough investigation. For example, when Dr. Hershenow told Krowen that his secretary would no longer type certain bills, Krowen did not make the obvious inquiry as to why she refused to do so. Similarly, the receipt of the "kickbacks" at very least suggested that the doctors would be likely to pad the bills; if they were to pay him as well as receive the full value of their own services, they would have to overcharge in some manner. The virtually automatic recovery of fees under PIP coverage, of course, made this easy.

That nine padded bills were brought to Krowen's personal attention cannot, moreover, be dismissed as insignificant, especially as some, like Coull's bill, were erroneous to a degree that could not fail to arouse suspicion in the most trusting breast. Krowen's willingness to bill the insurer, while accepting the doctor's bland assertion that he would make up on the order of 16 or 17 phony visits, strongly suggests that Krowen knew what was going on and willfully chose to blind himself to the details by accepting at face value so weak an excuse and promise.

Krowen responds by arguing that, even if the record contains sufficient evidence that he had a "high subjective awareness of wrongdoing," the district court nonetheless erred in giving the instruction because he did not *deliberately* attempt to avoid knowledge. Krowen contends that he took some action to resolve every billing discrepancy brought to his attention, either causing the staff to contact the doctors or dealing with the doctors directly himself. However, the jury was entitled to conclude that the investigations were insincere. They occurred in instances where some show of action on Krowen's part was called for if he was not to look as though he were a part of the fraud. In instances such as the Coull case, Krowen signed off on the basis of unconvincing representations from the doctors. The jury could have found that the investigations were intended mere-

ly to give the impression of investigating when Krowen was, in fact, altogether satisfied and had no intention to reveal or to stop the fraud.

### B. *Correctness of the Instruction*

■ Krowen next argues that the actual instruction given by the court failed to convey the essential requirements for proving knowledge by means of willful blindness. In particular, he claims that the instruction did not (1) explain the difference between the theories of conscious avoidance and willful blindness; (2) adequately advise the jury on knowledge and willful blindness; and (3) lay out "balancing language" in a manner understandable to an ordinary juror. The simple answer to this argument is that none of these refined objections was raised below, hence we may consider them on appeal only upon a showing of plain error.[6] *See* Fed.R.Crim.P. 52(b); *United States v. Jarabek,* 726 F.2d 889, 903 (1st Cir.1984); *United States v. Rosa,* 705 F.2d 1375, 1380 (1st Cir.1983). Clearly the charge withstands "plain error" analysis.

Appellant would like the court to have instructed the jury on the alleged difference between willful blindness and conscious avoidance. We are aware, however, of no case holding that willful blindness and conscious avoidance constitute two distinct, albeit closely related, legal doctrines. If such a distinction is useful, a question we do not consider, it is clearly one that should have been presented to the district judge, who could not have been expected to think of it *sua sponte.*

We also find Krowen's other objections to be without merit. The district court's charge embraced language set out in our decision in *United States v. Cincotta,* 689 F.2d 238 (1st Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982), and the Ninth Circuit's decision in *United States v. Jewell,* 532 F.2d 697 (9th Cir.), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49

L.Ed.2d 1188 (1976). It made clear that guilt could not be premised on negligence but required the jury to find knowledge on Krowen's part. We find no plain error.

## IV.

■ Krowen also claims the district court committed reversible error in excluding certain evidence bearing on a fraudulent bill submitted for one Percy Gandy who, in March of 1977, was injured in an automobile accident. Being one of Krowen's clients, he was referred to Dr. Hershenow. The latter, after seeing Gandy only once, billed him for eight visits. Somehow Gandy learned of the billing errors and brought it to Krowen's attention. Krowen responded by immediately notifying Drs. Hershenow and Rosenthal that he wished to discuss certain matters with them. Thus, sometime in 1979, Krowen, Hershenow and Rosenthal met in a Chinese restaurant on the North Shore.

On cross-examination, Krowen's attorney was questioning Dr. Rosenthal on the events surrounding the meeting at the Chinese restaurant. Rosenthal acknowledged that after the meeting, on their way back to Boston, he and Hershenow had a conversation pertaining to Krowen. When Krowen's attorney attempted to elicit the details of the conversation, the district court stopped him and asked for an offer of proof. The attorney stated that Rosenthal was going to testify, in substance, that he told Hershenow "Jesus Christ, if we ever send any phony bills to this guy and he finds out, we're through. We better make sure we see these patients, because if Jerry finds out, we're going to lose the hen that lays the golden egg." On the basis of this offer, the district court ruled that Rosenthal's testimony about the details of the conversation was inadmissible hearsay. On appeal, Krowen attacks this ruling, arguing that the statement was both relevant and admissible, and that the district court's

---

6. Krowen also objects that the "trial judge never, in the course of his instructions, referred to the facts of this case." Because he later admits

that "that in itself is not error," we need not discuss the issue.

decision deprived him of his constitutional right to confront witnesses.

Assuming, without deciding, that the district court committed error, the error was not prejudicial. During the later cross-examination of Dr. Hershenow, the district court reversed its prior ruling and permitted Krowen to explore the conversation in question. Thus, Hershenow was asked and acknowledged that on the trip back to Boston, Rosenthal said to him in essence that "this guy gives us a lot of business. We've got to be careful. No more fooling around with his cases." Indeed, although Rosenthal never testified to that particular conversation, he repeatedly stated that he was concerned that Krowen might learn of the fraudulent scheme. For example, when asked whether he believed Krowen "would drop [him] like a hot potato" if he found out about the fraudulent billings, Rosenthal responded, "that's correct." He also testified to expressing this sentiment to Dr. Hershenow.

On this record, any error committed by the district court in restricting Krowen's range of cross-examination was harmless. *See, e.g., United States v. Basile,* 569 F.2d 1053, 1057 (9th Cir.) (any error caused by court's exclusion of testimony on hearsay grounds is harmless when essence of testimony was eventually admitted), *cert. denied,* 436 U.S. 920, 98 S.Ct. 2268, 56 L.Ed.2d 761 (1978); *see also United States v. Baresh,* 790 F.2d 392, 400–01 (5th Cir. 1986); *United States v. Peyro,* 786 F.2d 826, 828–29 (8th Cir.1986). Krowen suffered no prejudice because of the court's ruling; Rosenthal and other witnesses amply testified to the substance of the excluded testimony.[7]

### V.

Finally, Krowen contends that the district court inadvertently charged the jury with a theory of the case never argued by either counsel. To come to this conclusion,

Krowen wrests one word from 30 pages of jury instructions and infuses that word with meaning unsupportable in the context of the entire instruction. We are not willing to do the same.

*Affirmed.*

---

[7]. We also think it significant that Krowen could have attempted subsequently to recall Rosenthal for the narrow purpose of inquiring into the content of the discussion with Hershenow. The district court, when allowing Krowen to examine Hershenow about the conversation, stated that "at this time in the case, I might allow in something I wouldn't let in before."