UNITED STATES of America, Appellee,

v.

Robert D. KAPLAN,
Defendant, Appellant.

No. 86–1557.

United States Court of Appeals,
First Circuit.

Heard April 9, 1987.

Decided Nov. 2, 1987.

Alan M. Dershowitz, Cambridge, Mass., with whom Robert D. Keefe, Robert W. Thuotte, Nancy A. McCann and Hale and Dorr, Boston, Mass., were on brief, for defendant, appellant.

Peter A. Mullin, Asst. U.S. Atty., with whom Robert S. Mueller, III, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and MALETZ,* Senior Judge.

TORRUELLA, Circuit Judge.

This case presents yet another example of an overly ambitious lawyer who finds himself convicted of knowingly and willfully participating with members of the medical profession in a scheme to defraud insurance companies in violation of 18 U.S.C. § 1341 (mail fraud) and § 2 (aiding and abetting in the commission of mail fraud). *See, e.g., United States v. Krowen,* 809 F.2d 144 (1st Cir.1987); *United States v. Lebovitz,* 669 F.2d 894 (3d Cir.), *cert. denied,* 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982); *United States v. Drury,* 687 F.2d 63 (5th Cir.1982), *cert. denied,* 461 U.S. 943, 103 S.Ct. 2119, 77 L.Ed.2d

1300 (1983); *United States v. Shavin,* 287 F.2d 647 (7th Cir.1961).

On September 6, 1985, a grand jury returned a 15 count indictment against Robert D. Kaplan (Kaplan) for having mailed to insurance companies claims containing fraudulent medical bills and reports in motor vehicle accident cases. After a 24 day trial a jury found Kaplan guilty on 14 of the counts. On appeal the assignment of errors relates to the denial of motions for a new trial and judgment of acquittal, jury instructions, the limitation of an opportunity for cross-examination, and to the admissibility of evidence. We affirm.

*Background*

During the relevant period of the indictment (from about 1973 through at least February 12, 1981), Massachusetts operated under a "no fault" automobile insurance system. The plan required an owner of a vehicle registered in the state to purchase personal injury protection ("PIP"). Under PIP coverage, a party injured in an accident could claim (regardless of fault) from the owner's insurer all reasonable and necessary expenses and a percentage of lost wages, up to a maximum of $2,000. *See* Mass.Gen.Laws Ann. ch. 90, § 34A (West Supp.1986). A negligence suit (referred to by Kaplan as a "third-party case") could not be brought unless *the medical expenses exceeded $500* or the accident resulted in death, disfigurement, fracture, or loss of a "body member," sight, or hearing. Mass.Gen.Laws Ann. ch. 231, § 6D (1985).

Kaplan became acquainted with the "no fault" law from his high-volume personal injury practice. The typical motor vehicle accident case handled by Kaplan involved relatively minor "soft-tissue" injuries such as neck and back pain as opposed to "hard tissue" injuries (*e.g.,* fractures). Briefly, the scheme operated as follows. If the client lacked his own physician, Kaplan would select for him a doctor from a "referral list" of forty to fifty medical providers. The list included doctors Hershenow, Rosenthal, Strauss, and Roodin who, it is uncontested, falsified bills by charging pa-

* Of the United States Court of International Trade, sitting by designation.

tients for visits that never occurred. Acting under Kaplan's directions, the doctor would send directly and only to Kaplan the patient's medical bills and reports. It is undisputed that Kaplan then would forward these, with the claim, to the insurer. Kaplan would distribute the award to his client, and would recommend to him how much to pay the doctors (the client would note that figure in a "direction to pay" form). Normally, Kaplan paid the doctors two-thirds of their bills and almost always by money orders. This set up was an economic incentive for Kaplan. In the PIP cases, Kaplan retained an amount based on an hourly fee to process the claim, whereas in the third-party case—*that is, when the bills exceeded the $500 threshold*—Kaplan operated under a contingent fee agreement retaining one-third of the recovery obtained by the client.

Kaplan's defense rests on the absence of specific intent, namely, that he never participated in the doctors' scheme knowing it to be fraudulent. This claim of innocence was supported by the following: 1) in the third-party cases medical providers were required by law to sign affidavits attesting the accuracy of their bills (and that Kaplan relied on the presumptively correct reports); 2) Kaplan's clients answered interrogatories propounded by insurance companies assuring that the amount charged by the doctor was accurate; 3) no medical provider ever told Kaplan about any false bills; 4) his employees did not know of or suspect the fraudulent scheme; and 5) because of the high workload at the law firm it was not unreasonable for Kaplan to lack knowledge of the scheme.

## I. *Sufficiency of the Evidence*

■ Kaplan argues that the court erred in denying a motion for judgment of acquittal because the evidence was legally insufficient to sustain the verdict. There is no dispute here about the existence of a fraudulent scheme and the mailings as elements of mail fraud. The only issue is whether the jury had enough evidence to find beyond a reasonable doubt that Kaplan knowingly participated in the scheme.

■ For us to sustain the jury's determinations we need not find a "smoking gun," in the sense that Kaplan had been told "the bills are false, do not mail the claims." It is sufficient if from the admissible circumstantial evidence a jury can infer and conclude beyond a reasonable doubt that indeed he knew the falsity of these claims. *United States v. Tierney*, 760 F.2d 382, 384 (1st Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *United States v. Cincotta*, 689 F.2d 238, 241 (1st Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982). In reviewing for sufficiency, we consider the evidence in toto—together with all legitimate inferences that can be drawn from the evidence—in the light most beneficial to the government. *See, e.g., United States v. Rothrock*, 806 F.2d 318, 320 (1st Cir.1986).

The scheme apparently grew out of a 1973 contact between Rosenthal, a chiropractor, and Kaplan. Rosenthal testified under immunity that Kaplan had agreed to refer clients to him, and in consideration Kaplan would pay him two-thirds of his billings. The other one-third, Kaplan had said, would go back to his clients or would be used to thank those who referred business to him. Payments were made by money orders, apparently to facilitate income tax evasion and to encourage the medical providers to accept less than payment in full. Rosenthal also testified that he recruited Dr. Hershenow, an internist, and told him about the financial arrangements with Kaplan. According to Rosenthal, Kaplan got "angry" upon learning about this and told Rosenthal never again to discuss this subject matter with anyone. Yet Hershenow testified that he later met with Kaplan when the latter explained the importance of the $500 threshold for medical expenses in the third-party cases. Hershenow agreed to accept referrals and partial payments from Kaplan only if the patients were actually injured in an accident. During their conversations, Kaplan told him that one-third of his bill was payable to auto body shops and to insurance companies which referred clients to the law office. If Hershenow himself did the refer-

rals, Kaplan would pay him one-hundred percent on the amount of his bills.

Not all doctors acquiesced in Kaplan's financial ideas. Dr. Taylor, a radiologist, testified under immunity that he complained to both Kaplan and Bernstein, Kaplan's office manager, that added fixed costs for radiological services had made it impossible for him to accept untimely and discounted payments. Taylor testified, uncontradicted by Bernstein's testimony at trial, that Kaplan had said that if he was unwilling to go along with it the office could refer clients to other "more cooperative" radiology services. Taylor said that subsequently Kaplan's referrals fell "almost to zero."

The pervasiveness of the fraud and the nature of the cases under Kaplan's responsibility laid the foundation for a permissible inference of knowledge. For example, Rosenthal testified that from 1973 through part of 1980 he accepted some 500 referrals from Kaplan of which 250 had false bills and reports. As extracted by the government from Rosenthal's internal medical files, some cases were particularly egregious. Rosenthal said that in the Bella Kaplan case (appellant's mother) he had inflated the number of visits for treatment. Kaplan had called Rosenthal to inform him that an investigator from the "fraudulent claims bureau" had questioned him regarding his mother's claim. Although Kaplan urged Rosenthal to verify the records, he never questioned the bills. The evidence also shows that Kaplan filed a PIP application on behalf of his wife. Yet Kaplan did not include Rosenthal's bill with the application in spite of the fact that this additional bill would have entitled her to bring a third-party action for negligence. The jury could well have concluded that Kaplan did not include the bill because he knew it was false.

The Neubstadt case is a good illustration of Kaplan's seemingly deliberate aloofness to the scheme. In that case, the Boston Municipal Court expressly found that Rosenthal's medical expenses were unreasonable and unnecessary. Yet Kaplan continued to refer clients to Rosenthal without ever inquiring from Rosenthal about the court's findings. And the insurers themselves gave Kaplan sufficient reason to believe the existence of wrongdoing. In the Howsworth case a claims adjustor wrote to Kaplan in 1974 "[i]n our opinion the injuries could not have been serious enough to warrant all treatment which Dr. Strauss has itemized." In spite of this, rather than investigating, in 1975 Kaplan ordered his assistant, Ina Brandt, to help Dr. Strauss prepare medical reports. Similarly, Rosenthal admitted to false billings in the Malgiolio–Pervutavich case in which Kaplan had written to his client on August 13, 1975:

Dear Brian:

Please note that Charles Malgiolio was in my office this morning, and we discussed the accident that you both were involved in on June 26th, 1974. And before I start a suit on behalf of Charley, I wanted to clear things with you to confirm whether or not you want me to press a suit on your behalf. In as much as the [adjustor] informed my office that you went to his office and told his supervisor that *you were not hurt as a result of the accident, and yet I have medical reports and bills from two doctors in my file.*

Would you kindly contact my office and make an appointment to come in so that you may discuss the same with me in person. If I do not hear from you within the next ten days, I will assume that you no longer are interested in pursuing this matter, and I will, accordingly, close out this file. Regards, very truly yours.

(Emphasis ours).

On September 4, 1975, Kaplan wrote to Dr. Rosenthal:

. . . enclosed herein find the self-explanatory letter of Brian Pervutavich dated August 13, 1975. In as much as I have not received a reply from him to date, I am, accordingly, closing out the file regarding his claim, and suggest that both of you and Dr. Stone contact Mr. Pervutavich direct.

Rosenthal testified that Kaplan neglected to ask him why he had issued a bill and report when his client, Pervutavich, had told the insurer he had not been injured in the accident. Kaplan simply implied in that letter "Rosenthal, you handle it."

Kaplan's repeated failure to investigate took on overtones of willfulness in the Jenkins case. McLoughlin, a lawyer employed by Kaplan, testified on cross-examination that Jenkins had told him that a medical bill was false. Instead of investigating the allegation, Kaplan refused to represent the client any further.

In spite of the above, Kaplan suggests on appeal that his employees had no reason to suspect any wrongdoing. This is not borne out by the record. Rosenthal testified that Ina Brandt would call him for another $50 or $100 in order to get the medical expenses past the $500 threshold. This is corroborated by a handwritten note from Brandt in the file related to her husband's case handled by Kaplan which reads "bills are now at 340." Rosenthal testified that subsequent to those conversations he would submit to Kaplan false addendum bills and reports.

Even Bernstein, Kaplan's office manager, suspected some wrongdoing, although he admitted never telling Kaplan about it. Bernstein testified that some bills showed an exaggerated number of visits in relation to the client's physical appearance and the nature of the ("soft-tissue") injuries. We find it entirely permissible for the jury to have inferred that Kaplan was at least as suspicious about billing discrepancies as Bernstein. In the words of his associates, Kaplan was the "boss." While assistants performed legal and clerical tasks, appellant's role in the office was crucial. He met with clients and referred them to various doctors, including doctors Rosenthal and Hershenow. These two doctors often sent false bills and reports directly and only to Kaplan. Kaplan then reviewed the client files, containing the bills, prior to disbursing an award to a client. Kaplan also had the final say on how much to charge clients in legal fees. At the disbursement conferences (at times handled personally by Kaplan) he paid the clients, recommended to clients an amount to pay on the bills, and completed and sent the money orders to the medical providers. For Kaplan now to hide behind the facade of a high-volume caseload to suggest lack of knowledge is surely disingenuous.

The money order arrangement also permitted the jury to infer a motive, *i.e.*, Kaplan's direct economic interest from participating in the scheme. A bank officer testified that money orders were always issued sequentially (in serial numbers). Kaplan's legal assistants would purchase money orders from the bank and would give them *in blank* to Kaplan. The money orders were drawn from the client's trust fund account. The record shows a series of money orders, payable to medical providers, and then following the same sequence two money orders purchased by Kaplan for his *personal use*. This permits an inference that, when paying to medical providers two-thirds of their bills, Kaplan pocketed the difference.

The fact that files and documents were removed from Kaplan's storage area adds to the overwhelming evidence of guilty knowledge. On February 1980, postal inspectors searched the doctors' offices. A federal grand jury returned an indictment against them a year later. An employee of Kaplan's testified that after the investigation became public, he saw Kaplan, Brandt, and Bernstein remove carbon copies of money orders and transmittal letters to doctors from Kaplan's files. This was corroborated by the testimony of Kaplan's mail clerk who said he had been ordered by Bernstein to remove documents from a storage area. The postal inspector's testimony further supports the inference of guilty knowledge. The inspector testified that, upon executing the warrant of Kaplan's storage area in March 1984 for 850 to 855 client files, he was able to search only nine or ten because certain boxes had been removed from the shelves. Bernstein, the office manager, claimed to the inspector lack of knowledge about the missing files.

While the evidence may be subject to a "reasonable hypothesis of innocence," the government need not refute every innocent

explanation as long as the evidence is legally sufficient to support the guilty verdict. *United States v. Rivera–Rodriguez,* 808 F.2d 886, 890 (1st Cir.1986). Our perusal of the record confirms there is sufficient evidence for a jury to convict Kaplan as charged beyond a reasonable doubt.

## II. *Jury Instructions*

■ The district court instructed the jury that the element of knowledge under the mail fraud statute could be satisfied by proof that Kaplan "deliberately closed his eyes to what otherwise would have been obvious to him," that "[r]efusing to investigate something that cries out for investigation may indicate that the person knows what the investigation would show," and that willful blindness constitutes knowledge if the defendant "was aware of a high probability that particular facts existed and he did not subjectively disbelieve the facts." Kaplan argues there is insufficient evidence that he *intentionally* · avoided knowledge of the illegal scheme.

To begin with, there is no question here that Kaplan asserts lack of knowledge, or that the instruction given by the court does not mandate an inference of knowledge. *See United States v. Picciandra,* 788 F.2d 39 (1st Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986). The only issue is whether the "facts suggest a conscious course of deliberate ignorance." *See id.* at 46; *see also, United States v. Masse,* 816 F.2d 805, 812 (1st Cir.1987) (framing the standard as whether appellant purposefully blinded himself while "knowing that a crime was likely in progress which [he] was facilitating.").

Although the list is not exhaustive, the following facts support the willful blindness instruction: (1) the testimony of Kaplan's office manager about suspected billing irregularities with respect to a client's injuries and his prolonged medical treatment; (2) evidence that insurers, and in one case a court itself, brought to Kaplan's attention unreasonable billing practices; (3) the pervasiveness of the fraud, in some cases involving Kaplan's family members. On these facts, a reasonable person should

have investigated, and Kaplan deliberately failed to act as one. And Kaplan was a person capable of detecting the signs of fraudulent billing. *See Masse,* 816 F.2d at 812. Kaplan retained control over *his* firm, and his actions in mailing the insurance claims were crucial for the success of the venture. *See Krowen,* 809 F.2d at 148–50. The jury could have inferred that if Kaplan actually and positively lacked knowledge it was because he *intentionally* chose to avoid it. The instruction was apropos here.

Kaplan contends next that the court erroneously refused his request for a *Maniego* instruction. In *United States v. Maniego,* 710 F.2d 24, 28 (2d Cir.1983), the court instructed the jury "that an attorney is not held to a higher standard of conduct, or legal obligation, to verify independently the truth of the information given by a client."

■ The government asserts that Kaplan did not specifically object under Fed.R. Crim.P. 30. We disagree. At the close of the government's case, over the prosecutor's objection, appellant distinctly requested a *Maniego* instruction, at which time the court reserved decision on the matter. After the charge, but before the jury retired to deliberate, counsel requested "an instruction on the attorney's duty of verification" (undeniably referring to *Maniego* ) which the court denied. We do not think that Kaplan at the time had to *argue* for *Maniego* or repeat the magic word "objection." Counsel did what Rule 30 required of him, *i.e.,* put the trial judge on *notice* so that a possible error could be corrected before the deliberation process began. *Cf. United States v. Rollins,* 784 F.2d 35, 37 (1st Cir.1986). Accordingly, the district court's ruling is subject to an abuse of discretion standard. *See Picciandra,* 788 F.2d at 46.

■ Appellant urges that *Maniego* was appropriate on the basis of the following excerpts from the prosecutor's closing and rebuttal arguments:

[I]t [the complaint against Rosenthal] puts you on notice if you are a legitimate lawyer and you only want to submit legitimate bills, it would cause you to inquire, to be skeptical. Is that what Mr.

Kaplan did? . . . . If you are a legitimate lawyer and you want to send legitimate bills, wouldn't you have made an inquiry? Isn't that willful blindness? Tr. 19/44.

\*   \*   \*   \*   \*   \*

Mr. Keefe says that the Drs. Rosenthal and Hershenow fooled [a] lot of people. He says they fooled other attorneys. There is no evidence that they fooled other attorneys. The only evidence is that they wrote false bills for other attorneys. Tr. 19/124.

\*   \*   \*   \*   \*   \*

Do you think that [Rosenthal's false bills] would [put] a legitimate law office on notice? Do you think people would question all those handwritten bills? Tr. 19/40.

Appellant's reading of the trial transcript is too thin. The prosecutor did not attempt to create the impression that Kaplan should be held to a higher standard of care. *Id.* at 46. These comments were directed towards Kaplan's role (as a lawyer) which was central to the scheme. Neither can those isolated remarks, when tested with the record as a whole, be construed as permitting such an inference. *See id.* To the contrary, the prosecutor continually referred in his argument (we count four occasions) to a reasonable person standard regarding a duty to investigate. We find no abuse of discretion here.

### III. *Limitation on the Scope of Cross–Examination*

Alan Brown was the only government witness who testified about telling Kaplan himself that a doctor's bill was false in a case in which Kaplan had represented him. During *voir dire,* the defense sought to introduce impeachment evidence regarding Brown's use (two to four times a month) of non-prescription drugs (specifically cocaine) at the time he made the incriminating statement. Contrary to the government's contentions, Kaplan specifically sought to challenge below Brown's credibility (poor or affected memory, perception, etc.) and to show bias (a motive to falsify in the government's favor). Kaplan offered to prove that if the jury had known that the government became "interested" in Brown's use of cocaine, and that the government had given Brown immunity in return for his testimony, it could have inferred Brown had reason to lie. But Brown, when confronted outside the presence of the jury about his cocaine use, invoked the fifth amendment privilege against self-incrimination. The government argued that limiting cross-examination would merely prevent questions "to which there would have been no answer." The district court agreed, apparently ruling under Fed.R.Evid. 401, 403, 611(a)(3), that Kaplan's line of inquiry was marginally relevant, and in any event, its unfairly prejudicial effect outweighed its probative value. The court then refused to permit any questioning that would cause Brown to invoke the fifth amendment before the jury.

Kaplan contends that the district court completely foreclosed an opportunity to cross-examine Brown on bias and impeachment in violation of his sixth amendment rights. We have said that a court can, in its discretion, restrict the scope of cross-examination only after it has afforded defendant the constitutional minimum, *i.e.,* an opportunity for effective cross-examination at trial. *See United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982). The first question then is whether Kaplan was afforded such an opportunity. In *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), a defendant's sixth amendment rights were infringed when the court, by prohibiting *all inquiry* into a witness' probationary status as a juvenile delinquent, completely foreclosed an opportunity to show bias in favor of the prosecution. *Accord Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

This case is unlike *Davis* in many respects. Most important, defense counsel ably undermined Brown's credibility during cross-examination. Brown admitted at trial that he *believed* he was testifying under a grant of immunity and that his attorney had negotiated such an arrangement with the government prior to his grand jury

appearance in this case. This allows us to conclude that the jury had a sufficient basis to question this witness' motivations and biases even without the cocaine evidence. *See Tracey*, 675 F.2d at 439. Further, an effective cross-examination in *Davis* would have been crucial to the defense. In *Davis* there is no indication that the witness would or could have invoked a right to remain silent about his juvenile record. Consequently, cross-examination in *Davis* would have revealed specific information strongly suggesting bias. In this case, cross-examination of Brown would have led only to invocation of the fifth amendment. That would have helped to impeach him, because it permitted a negative inference, but would not have been as essential to the defense case as would the specific information in *Davis* regarding the witness' record and probationary status.

As to impeachment generally, counsel successfully attacked Brown's reliability and trustworthiness. Brown concededly lied to a postal inspector investigating the case and to doctors regarding his treatments. Brown also demonstrated at trial poor recollection of details regarding Kaplan's representation in his case and about his own personal life. A juror reasonably could have concluded that Brown's testimony was inherently unreliable especially as to the alleged incriminating statement made about 11 years before trial. We hold that the proscription from inquiring about cocaine use did not insulate Brown's testimony from effective cross-examination as guaranteed by the sixth amendment.

■ Whether the court's evidentiary ruling nevertheless constitutes an abuse of discretion is another matter. Kaplan persuasively argues that, when a non-party government *witness* invokes the fifth amendment on cross-examination at trial, the court should permit the assertion of the privilege in the presence of the jury. The invocation of the privilege acts as a form of impeachment.

In *United States v. Johnson*, 488 F.2d 1206 (1st Cir.1973), the defense sought to have a witness testify on *direct* only to have him assert the fifth amendment be-

fore the jury. We held that if "a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand." *Id.* at 1211. Our reference there to *Bowles v. United States*, 439 F.2d 536, 541 (D.C.Cir.1970) (en banc), *cert. denied*, 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971), implied that the witness' assertion of the privilege, intended as permitting an inference of guilt or innocence, could have a disproportionate, probative impact on the mind of the average juror.

A different case is presented where, as here, the defense seeks to cross-examine a government witness within the scope of his direct and then the witness asserts the privilege. We note, first, that the impact on the jury's deliberations from asserting the privilege has to be less here than in *Johnson* from the fact that Brown did not claim the privilege comprehensively. Instead, Brown answered most questions put to him by the defense and would have refused to answer at trial only those bearing on the alleged cocaine abuse. And whatever danger exists that the jury may give too much weight to this line of questioning is small in comparison to its impeachment value. *See United States v. Seifert*, 648 F.2d 557 (9th Cir.1980).

In *Seifert*, the Ninth Circuit confronted the issue before us and ratified similar questioning by drawing an analogy to *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917). *Caminetti* held that when a *defendant* voluntarily takes the stand and then refuses to testify on cross-examination (as to matters raised on direct) he can be impeached by letting the jury draw adverse inferences from his silence.

We agree with the *Seifert* court. We hold that the district court's refusal to force Alan Brown to assert his fifth amendment privilege before the jury was error. None of the permissible reasons for circumscribing the scope of a criminal defendant's constitutional right to cross-examination—harassment, prejudice, confusion, repetitiveness, marginal relevance, for example—warranted such a ruling. *See Van*

*Arsdall,* 106 S.Ct. at 1435. Although the fact that Brown asserted the privilege was only marginally relevant to the issue of his bias, we note Judge Weinstein's observation that "[t]he credibility of a witness can always be attacked by showing that his capacity to observe, remember, or narrate is impaired." J. Weinstein & M. Berger, 3 *Weinstein's Evidence* ¶ 607[04], at 607–55 (1987). Kaplan was entitled not to be denied the benefit of the jury's likely inference, from Brown's assertion of the privilege, that Brown was using cocaine around the times relevant to his testimony, and to the secondary inference that his powers of memory or observation thus may have been impaired. However, any error in this regard does not warrant a reversal or a new trial. Given the substantial other evidence of guilty knowledge before the jury, and the thorough cross-examination permitted here, the error is harmless beyond a reasonable doubt. *Van Arsdall,* 106 S.Ct. at 1438.

## IV. *Admissibility of Statements by Joint Venturers*

Kaplan attacks the admission of statements from conversations between Drs. Rosenthal and Hershenow and between Rosenthal and Shraiar, a pharmacist. The challenged declarations relate to Rosenthal's recruitment of Hershenow in 1973, to his explanation about the referral system and partial payment method with Kaplan, and to his intention of developing a practice of cross-referrals with Hershenow in personal injury cases handled by Kaplan. Kaplan also sought to exclude on hearsay grounds Rosenthal's statement that he had requested from Shraiar (from 1976 through 1978) false bills in some of Kaplan's cases. Over defendant's specific objections, the court provisionally admitted these declarations under Fed.R.Evid. 801(d)(2)(E), subject to a *Petrozziello* finding at the end of trial that:

> it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement[s] [were] made, and that the statement[s] [were] in furtherance of the conspiracy.

*United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977).

We find no merit to the argument that the court cannot consider under *Petrozziello* those events occurring *after* the proferred statements as proof of defendant's participation in a conspiracy or a joint venture. *See United States v. Silvano,* 812 F.2d 754, 762 (1st Cir.1987); *see also United States v. Reynolds,* 828 F.2d 46, 47–48 (1st Cir.1987). A related contention is that Rosenthal's statements were inadmissible against Kaplan since he was unaware that Rosenthal had ever requested false bills from Shraiar. This claim is unavailable. *See United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987) (when a party knowingly joins a conspiracy he takes responsibility for the conspirator's conduct regardless of whether he is aware of every detail).

We now review the court's findings for clear error. *United States v. Williams,* 809 F.2d 75, 89 (1st Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1959, 95 L.Ed.2d 531 (1987). The court's finding of a scheme or joint venture to defraud is undisputed. Its conclusion that defendant knowingly participated in the scheme was based on preponderant evidence on the record as a whole: (1) Kaplan's authority and control over his firm, particularly over disbursements to clients and doctors; (2) Rosenthal's meeting with Kaplan in 1973 regarding partial payment of bills in money orders; (3) the referral arrangement; and (4) Kaplan's expression of anger from Rosenthal's revelations to Hershenow. We find no clear error as to these findings.

Furthermore, we hold that the statements were made "during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). The record supports that the challenged statements, occurring in 1973 and between 1976–1978, were within the time frame of the fraudulent scheme as charged in the indictment. And the declarations, as they advanced the objectives of the scheme were made "in furtherance" thereof. *United States v. Fahey,* 769 F.2d 829, 839 (1st Cir.1985).

The scheme was like a mathematical equation. On one side, Kaplan paid less than the *face* value of the bills. On the other, the face value was *higher* than their real value, since most bills submitted by Rosenthal and Hershenow were inflated. Thus, Rosenthal's statements permitted an inference that the *profitability* of the discounted payment plan with Kaplan turned on whether Shraiar understood he had to submit false bills to Kaplan and on whether Hershenow willingly accepted discounted payments from Kaplan. In that sense, the statements advanced the scheme.

### V. *The Internal Medical Files and the Coconspirator Exception*

The government introduced at trial the records of Drs. Rosenthal and Hershenow and Dr. Strauss' patient cards to prove the magnitude of the fraud and to corroborate the testimony about falsification of bills. Over defendant's general hearsay objection, the court admitted the files as part of its *Petrozziello* ruling discussed before.[1] Kaplan focuses this appeal on specific portions of the Rosenthal/Hershenow files to argue against their admissibility. Appellant divides those files into two parts—first the "dictated notes" (containing accurate treatment dates) and second the "patient file cover sheets" (containing information used to generate false bills).

Assuming those statements were hearsay (and the government concedes as much with respect to the dictated notes), we find no clear error in the court's ruling they were admissible as coconspirator statements under Rule 801(d)(2)(E). The record supports that (1) defendant knowingly participated in a fraudulent scheme, and (2) the statements were made during the course of the scheme. *See ante* at 685.

The more difficult question is whether the statements were made "in furtherance" of the scheme. Relying on *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716,

93 L.Ed. 790 (1949), appellant maintains that the internal medical files (allegedly never seen by Kaplan) were kept to conceal any wrongdoing and thus were not "in furtherance" of the scheme. *Krulewitch* held that, *once the objectives of the conspiracy have been accomplished,* any declarations regarding efforts to conceal the conspiracy are inadmissible. *Id.* at 442, 69 S.Ct. at 717–18; *see also United States v. Palow,* 777 F.2d 52, 57 (1st Cir.1985), *cert. denied,* 475 U.S. 1052, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986) (post-arrest statements not in furtherance of the conspiracy). Such is not the case before us however. Even if the doctors maintained "accurate" medical records to avoid getting caught, their actions clearly furthered the "main objectives of the conspiracy." *United States v. Davis,* 623 F.2d 188, 192 (1st Cir.1980).

The main objective of the scheme here was to trick insurance companies into paying what appeared to be legitimate claims. And its success depended on whether the bills appeared truthful. In fact, Kaplan argued to the jury that the bills looked so reliable that they fooled fellow attorneys—himself included—and a few insurance companies. The following excerpt from the government's direct examination of Rosenthal underscores the importance of the internal records for insuring the "legitimacy" of the bills:

Q ... First of all, maybe we ought to go through several documents in the file.

This is what's known as the front sheet or the cover to your file; is that correct?

A That's correct.

Q All right. And at least certainly for the initial date of visit, that would be filled out by one of your staff?

A In most cases, yes, sir.

Q All right. And then, in addition, that file would be kept in your office; and when patients came in, the date of the visit would be recorded on the form; is that correct?

---

**1.** In view of our disposition of this matter under the coconspirator exception, we need not decide the adequacy of defendant's hearsay objections. We also find it unnecessary to reach the government's contentions that the files were admissible under the business records exception to the hearsay rule, Fed.R.Evid. 803(6).

A That's also correct.

Q Now, in addition, did you on occasion just put dates of visit on those forms?

A Yes.

Q Now, in connection with the preparation of your bills and reports, what use would be made of this form?

A It served a multi-purpose. The first use, obviously, is to try to keep track of the patient visits. The second use was to give the secretaries some indication of the billing procedure. Obviously, there is some financial information; also where I referred the people. It's sort of an all in one type sheet.

Q In the course of preparing your reports and the attached bills, how did you typically get the information from you to your secretaries for the actual typing?

A For the billing?

Q Yes.

A It was—that's—what they saw on here is what they typed the bill off of [sic].

Q In other words, you would give them instructions that they were to show as dates of visits of the information recorded on the front of the form?

A That's correct.

Q And if you falsely inflated a file, you would make a notation on the front of the file of the date of visit?

A That's correct.

The records were essential for keeping accurately *false* bills. And it was through the collection of these bills, after all, that the conspirators realized the fruits of their fraudulent endeavors. These statements contributed to the objectives and ultimate success of the scheme, and were admissible evidence against Kaplan. *See Fahey,* 769 F.2d at 839.[2]

## VI. *The Evidence Regarding the Flood at the Defendant's Home and the Search of his Law Office Storage Area*

██ The court admitted a stipulation that certain documents from Kaplan's client files subpoenaed by the government were destroyed in a 1983 flood occurring at defendant's vacation cottage. The government tried to show at trial this was a false exculpatory statement. As far as the record shows, Kaplan objected below only for lack of relevance. Fed.R.Evid. 401. We agree with the court's ruling. False exculpatory declarations are relevant to show a guilty state of mind. *Wilson v. United States,* 162 U.S. 613, 620-21, 16 S.Ct. 895, 898-99, 40 L.Ed. 1090 (1896). Whether the stipulation was false or not was strictly for the jury to decide, and had no bearing upon its admissibility under Rule 401.

██ As to the removal of files and search evidence, Kaplan objected for lack of probative value. Fed.R.Evid. 403. Kaplan's principal claim is that the removal of the files permitted *only* an inference that Kaplan intended to protect attorney-client confidences. The district court concluded that since the jury could have inferred some ulterior motive besides protecting client confidences, the evidence was probative and not unfairly prejudicial to appellant. We find no abuse of discretion to upset this finding. *See Jarabek,* 726 F.2d at 903.

## VII. *Conclusion*

Appellant was fairly tried and squarely convicted. The court properly denied his motions for a new trial and judgment of acquittal.

*Affirmed.*

---

2. The court also ruled that the internal medical records were relevant, probative, and not unfairly prejudicial to Kaplan. Fed.R.Evid. 401,

403. We find no abuse of discretion as to that finding. *See United States v. Jarabek,* 726 F.2d 889, 903 (1st Cir.1984).