[NOT FOR PUBLICATION]

United States Court of Appeals
For the First Circuit


No. 95-1437

UNITED STATES OF AMERICA,

Appellee,

v.

KENNETH SCHIAVO,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge] 



Before

Lynch, Circuit Judge, 
Coffin, Senior Circuit Judge, 
and Cummings,* Circuit Judge. 



Ronald Kovner with whom Paul F. Markham was on brief for 
appellant.
Dina Michael Chaitowitz, Assistant United States Attorney, with 
whom Donald K. Stern, United States Attorney, was on brief for 
appellee.



August 19, 1996


 

*Of the Seventh Circuit, sitting by designation.

COFFIN, Senior Circuit Judge. Defendant Kenneth Schiavo 

appeals his conviction for conspiring to possess, and possessing,

cocaine with intent to distribute in violation of 21 U.S.C. 

841(a)(1) & 846. After careful consideration, we affirm.

I. BACKGROUND

We briefly sketch the facts underlying this case, as the

jury might have found them, saving detail for our analysis of

specific claims. Defendant Schiavo was involved in a cocaine

distribution scheme with Howard Winter and Gennaro Farina that

operated in Massachusetts for an extended period of time in the

early 1990s. Winter was the target of a joint investigation into

drug trafficking conducted during this time by the Drug

Enforcement Agency (DEA) and the Massachusetts State Police.

With assistance from a confidential informant (CI), the law

enforcement agencies developed extensive evidence through direct

and electronic surveillance.

The CI, who had been a regular customer of Winter's before

going to work for the government in April 1991, reported that in

the spring of 1990 Winter had disclosed to him that "Kenny . . .

was the supplier" of the cocaine that the CI had been purchasing.

From May to November 1991, the CI engaged in five controlled buys

through Winter. A pattern emerged from these transactions:

after Winter discussed a potential sale with the CI, he called or

met Schiavo, and then reported pertinent information back to the

CI.

-2-

The final transaction provided the most direct link between

Schiavo and the conspiracy. On November 4, 1991, the CI gave

Winter a New Balance bag containing $9,000 in identifiable bills

as partial payment for cocaine delivered November 1. Soon

thereafter, Winter and Schiavo met at a restaurant in Chelsea.

Schiavo was followed from there and, in accordance with a

prearranged plan, stopped by Trooper Thomas Duffy. Duffy

approached Schiavo, observed a bulge in his jacket, frisked him

for weapons and discovered the New Balance bag. The officer

seized the money in the bag and additional cash carried by

Schiavo -- a total of $12,500 -- but did not arrest him. 

In January 1992, a grand jury returned a multiple count

indictment against Schiavo, Winter and Farina, charging

participation in a drug conspiracy from May 1991 to January 5,

1992, and five substantive counts of possessing and distributing

cocaine. Schiavo was charged on three of the substantive counts.

Following his arrest, he successfully moved to suppress the bag

of money.1

On September 1, 1994, shortly before trial was scheduled to

begin, Schiavo was charged in a superseding indictment that

pushed the conspiracy's start date back eighteen months to

December 1989 and added two substantive counts. Schiavo filed a

motion to dismiss the superseding indictment, which was denied.

The trial eventually began on November 14, 1994. The jury

 

1 The suppression was affirmed by this court. 29 F.3d 6
(1st Cir. 1994).

-3-

returned guilty verdicts on the conspiracy charge and the three

substantive counts originally charged.

Schiavo raises six issues on appeal: (1) a double jeopardy

violation; (2) improper admission of testimony about the stop and

frisk on November 4, 1992; (3) insufficient evidence that he

participated in a conspiracy spanning the term charged in the

superseding indictment; (4) improper admission of the CI's

reported statement from Winter that Schiavo was the cocaine

supplier; (5) prosecutorial vindictiveness; and (6) a violation

of the Speedy Trial Act. We discuss each in turn.

II. DISCUSSION

A. Double Jeopardy 

Pursuant to 21 U.S.C. 881(a)(6), the DEA obtained civil

forfeiture of $5,090 of Schiavo's money.2 Schiavo claims that

his criminal conviction following this forfeiture constitutes a

second punishment for a single offense, and thus violates the

constitutional proscription of double jeopardy. This argument

was firmly rejected by United States v. Ursery, 116 S. Ct. 2135, 

2149 (1996), where the Supreme Court held, inter alia, that an in 

rem civil forfeiture under 881(a)(6) is "neither 'punishment'

nor criminal for purposes of the Double Jeopardy Clause."

B. Testimony Relating to the Stop and Frisk 

 

2 The DEA instituted separate forfeiture proceedings
against the $3500 of non-governmental money seized on November 4,
1991 and the $1590 seized from Schiavo at the time of his arrest
on March 5, 1993.

-4-

On Schiavo's original motion to suppress, the court ruled

that Duffy's search reached its constitutional limit at the

completion of the initial pat frisk, which confirmed that Schiavo

was not carrying any weapons. Accordingly, the court suppressed

all items seized after this point, in particular, the bag of

currency.

At trial, Duffy recounted his stop-and-frisk encounter with

Schiavo. 

Q. And did you approach Mr. Schiavo?
A. Yes, I did.
Q. And did you notice anything upon approaching Mr. Schiavo
after you pulled him over?
A. I did.
Q. What did you observe?
A. I noticed the large bulge in his left breast area.
Q. After you noticed this bulge, what did you do?
A. I did an initial pat frisk of that area and I asked if 
that was all him.
Q. And how did Mr. Schiavo respond when you pat frisked him
and asked him if it was all him?
A. He responded "Mostly."
Q. Did you make any other comments concerning the bulge in
his jacket at that point in time?
A. Yes.
Q. What did you say?
A. I asked him more than once if he had a weapon.
Q. Did you ask him anything else?
A. As I was touching that area of his chest, I asked him
what it was.
He replied, "It's a bag."
I said, "It's an awful big bulge for a bag."
He responded, "It's big." 

Schiavo complains that it was error to allow any testimony

regarding the stop, especially testimony that related to the

suppressed bag of currency. For a number of reasons, we

disagree. 

Most significantly, Schiavo's motion to suppress referenced

only "items seized," not statements made. This distinction was

-5-

confirmed at the suppression hearing, where Schiavo's counsel

made clear that defendant's statements were not at issue.3 On

November 14, 1994, the first day of trial, Schiavo filed a motion

in limine requesting exclusion of "any evidence concerning the

'serialized' currency," but it was not until November 21, 1994,

that Schiavo filed a motion to suppress any and all statements

made by him on November 4, 1991. The court properly denied the

motion as untimely, see Fed. R. Crim. P. 12(b)(3), and without 

merit, but nonetheless suppressed statements made after the

illegal seizure of the bag of currency. 

We think the court's reasoning, that the completion of the

pat frisk separated admissible from inadmissible statements, is

unassailable. The frisk antedated the unconstitutional conduct;

accordingly, information derived during it cannot be considered

fruit of the poisonous tree. See United States v. Crews, 445 

U.S. 463, 470-71 (1980). Moreover, the court's assessment of

where the pat frisk ended was cautious and to the defendant's

benefit. The statement "It's big" fell well within its span.

Schiavo alternatively seeks exclusion of the statements

based on the absence of Miranda warnings. This contention was 

not raised in any manner below and is waived.4
 

3 The Court: So, in other words, there is no motion to
suppress any statements that may or may not be made,
we're just concerned with suppression of the money?

Schiavo's Counsel: Correct, your Honor.

4 In any event, the statements were made during a lawful
stop and frisk under Terry v. Ohio, 392 U.S. 1 (1968). See 29 
F.3d at 9. Schiavo was not in custody at the time, and,

-6-

C. Claims Based on Length of the Conspiracy 

Schiavo contends that the government's evidence failed to

link him to a conspiracy lasting from December 1989 to January

1992. He therefore argues that the jury's guilty verdict on the

conspiracy charge must be vacated and that the coconspirator

statement made in 1990 was improperly admitted. We think it

helpful to set forth in detail the evidence presented at trial

relevant to the conspiracy charge before analyzing his claims of

error.

The 1990 Transactions 

The CI detailed seven transactions that took place between

January and November 1990, before his involvement with the

government. The CI arranged these deals through Winter, who

then, usually accompanied by Farina, delivered the cocaine,

though the drugs were once delivered by Farina and another time

by Winter's son. Without exception, the CI received the cocaine

on credit, paying Winter within a few days.

The CI learned of Schiavo's participation during the fifth

transaction, which occurred in May or June of 1990. On that

occasion, according to his testimony, the CI drove with Winter to

the Assembly Mall parking lot in Somerville, Massachusetts.

Schiavo arrived soon thereafter and parked nearby. Winter

approached Schiavo, received a bag from him, returned and handed

the bag to the CI. The bag contained one kilogram of cocaine.

 

therefore, Miranda warnings were not warranted. See United 
States v. Quinn, 815 F.2d 153, 160-61 (1st Cir. 1987). 

-7-

The CI testified that he then inquired into the deliverer's

identity: "I asked Howie who this gentleman was and he said it

was Kenny and that he was the supplier for the products."

-8-

The CI's Cessation of Activities 

In November 1990, Winter advised the CI not to use

telephones because of "a 3T investigation."5 Upon hearing this,

the CI terminated his business with Winter. The conspirators'

awareness of the DEA investigation was further demonstrated by a

phone conversation intercepted on November 22, in which Schiavo's

son indicated to a friend that the police were listening. Later

that same day, Schiavo and Winter met briefly on a street corner

in Medford.

The CI could not provide information about the period

between November 1990 and May 1991. Nonetheless, NYNEX phone

records established that a number of calls were placed between

the residences of Schiavo and Winter during this time.6

The 1991 Transactions 

The 1991 controlled transactions were documented by personal

and electronic surveillance. The CI reinitiated contact with

Winter on May 20, 1991, and met with him the next day. On May

22, Winter and Farina delivered one kilogram of cocaine to the

 

5 According to a DEA agent, 3T refers to electronic
surveillance authorized pursuant to Title III of the Omnibus
Crime Control and Safe Streets Act, 18 U.S.C. 2510-2522. From
November to early December 1990, the government had wiretapped
one telephone of Winter's and two telephones of Schiavo's.

6 The phone records entered as exhibits at trial were not
included in the appellate record. We accept the representations
of the government at closing argument and in its brief as to what
these records reflect about the number and timing of specific
calls. The defendant's closing argument and brief indicate that
there is no dispute as to the contents of these exhibits.

-9-

CI; on June 13, 1991, they delivered two.7 In each case, payment

was rendered the following day. At significant points during

each deal -- on May 22, near the time that the CI called Winter

to arrange for payment; on June 12, following the CI's order for

two kilograms; and on June 14, following the CI's payment to

Winter -- calls were placed from Winter's home to Schiavo's.

On the morning of August 1, the CI picked up Winter and

ordered two kilograms of cocaine. After stopping to make a phone

call, Winter informed the CI that, "He's gonna meet me." They

proceeded to a Caldor's parking lot in Brighton, where Schiavo

soon arrived. After meeting briefly with Schiavo, Winter

returned to the car and told the CI, that "[We're] gonna meet him

at 12 o'clock." Schiavo returned to Somerville, and parked his

car near Farina's. At approximately 12:00 p.m., Farina delivered

one kilogram of cocaine to the CI. 

On August 2, the CI paid Winter and asked about the other

kilogram of cocaine. Winter responded "let me call him up," and

then placed a call to Schiavo's home. He then advised the CI

that "he's still trying to -- to get that other one," and that

"if he can get it out there, whatever time, I'll just give you

the time and that kid8 will be there." The next day, Farina

delivered a kilogram of cocaine to the CI. The CI paid Winter

 

7 These transactions served as the basis for the two counts
of the superseding indictment for which Schiavo was found not
guilty.

8 Earlier in the conversation, Winter had referred to "that
kid Gerry" -- i.e., Farina. 

-10-

for this cocaine on August 8. On August 9, Winter met with

Schiavo for several minutes in the parking lot of the Sheraton

Tara hotel in Framingham.

On October 31, the CI, while driving with Winter, ordered

another kilogram of cocaine. Winter placed a phone call to

Schiavo's residence and arranged to meet him at a Dunkin Donuts.

Winter and Schiavo met briefly, and Winter informed the CI that

he could pick up the kilogram later in the day. Due to a

misunderstanding -- the CI apparently went to the wrong location

-- the cocaine was not delivered until the following morning,

when Winter brought it to the CI's home.

As discussed above, the CI gave Winter $9,000 in a bag on

November 4. A short time later, Winter and Schiavo arrived

separately at the Chandlery Restaurant in Chelsea. Upon

departing and being stopped and frisked by Trooper Duffy, Schiavo

stated that he was carrying a big bag. On November 6, the CI

paid Winter the balance owed on the one kilogram.

1. The Conspiracy Verdict 

Schiavo contends that the evidence failed to establish the

single conspiracy charged, and suggests that, at best, only

multiple conspiracies were proved. We review the jury's

determination for evidentiary sufficiency, United States v. 

Wihbey, 75 F.3d 761, 774 (1st Cir. 1996), and affirm if a 

rational jury could have found guilt beyond a reasonable doubt.

United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995). 

-11-

The controlled nature of the 1991 deals, conducted under

extensive surveillance, yielded substantial evidence of Schiavo's

involvement in the cocaine conspiracy. For example, Winter

consistently called, or arranged to meet, Schiavo whenever the CI

ordered or paid for cocaine. This indicated that Schiavo played

a major role in the operation. Moreover, the jury could

reasonably infer, based on Schiavo's comments to Trooper Duffy,

that the bag on his person was the bag of money delivered by the

CI to Winter. Notwithstanding Schiavo's protestations,

there was significant evidence that this conspiracy commenced

many months earlier. First, the particulars of the 1991

transactions were consistent with the 1990 ones: the CI ordered

cocaine from Winter, received it from Winter and/or Farina, and

paid Winter for it within a few days. Both series of

transactions involved the same people, contemplated the same

ends, and used the same means to reach those ends, all of which

signify one continuous conspiracy. See United States v. David, 

940 F.2d 722, 734 (1st Cir. 1991). Even more compelling, the CI

observed Schiavo deliver cocaine to Winter in the spring of 1990,

at which time Winter identified Schiavo as the supplier of the

drugs.9 

Schiavo's essential argument is that there was a lapse of

six months in which the government failed to identify a

substantive transaction. We do not think that a lapse of time

 

9 We explain the admissibility of this statement in the
next section.

-12-

per se transforms a single conspiracy into multiple conspiracies. 

See United States v. Williamson, 53 F.3d 1500, 1513 & n.6 (10th 

Cir. 1995) (citing cases from other circuits); United States v. 

Maldanado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990). There is no 

indication whatsoever that Schiavo withdrew from the conspiracy.

Indeed, phone records indicate that Schiavo and Winter regularly

communicated during the supposed period of inactivity. Moreover,

based on the events in November 1990 -- Winter's comment to the

CI, Schiavo's son's intercepted conversation, and the meeting

between Winter and Schiavo -- it is reasonable to infer that

Schiavo and Winter were well aware of the increased federal

surveillance, and resolved to be more cautious in their

activities.

In short, the fact that there is no direct evidence of

cocaine transactions from late November 1990 to late May 1991

does not negate the evidence of a continuing conspiracy.

Accordingly, we find the evidence sufficient to support the

verdict.10

2. Admission of Winter's Statement 

Schiavo complains of the court's admission of Winter's 1990

statement identifying him as "the supplier." The court allowed

the remark as a statement made by a coconspirator under Fed. R.

 

10 Because the evidence supports the single conspiracy
charged in the indictment, we need not address the issues of
variance and prejudice that are common components of multiple
conspiracy claims. See Wihbey, 75 F.3d at 774. 

-13-

Evid. 801(d)(2)(E).11 Schiavo contends that there was no

evidence that Schiavo and Winter were coconspirators at the time.

The court, based on a preponderance of the evidence, reached the

opposite conclusion. We review its factual findings for clear

error. United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 

1993).

The law in this area is well settled. "To invoke the

[801(d)(2)(E)] exception, a party who wants to introduce a

particular statement must show by a preponderance of the evidence

that a conspiracy embracing both the declarant and the defendant

existed, and that the declarant uttered the statement during and

in furtherance of the conspiracy." United States v. Flores- 

Rivera, 56 F.3d 319, 329 (1st Cir. 1995) (internal quotation 

marks and citations omitted). This determination is the province

of the court. United States v. Petrozziello, 548 F.2d 20, 23 

(1st Cir. 1977). 

During a conference near the end of trial, the court made

explicit findings under Petrozziello, stating  

I have to make that finding at the close of all the
testimony[] -- that Mr. Winter and Mr. Schiavo and Mr.
Farina were members of the conspiracy at the time the
statements were made and that the statements were made
during the course of and in furtherance of the
conspiracy. I do find that by a preponderance.12
 

11 Rule 801(d)(2)(E) provides that "a statement by a
coconspirator of a party during the course and in furtherance of
the conspiracy" is not hearsay.

12 We note that the judge's interpretation of the law was
more favorable to Schiavo than required: a defendant is subject
to proof of the comments of coconspirators made prior to his
involvement in the conspiracy. United States v. Masse, 816 F.2d 

-14-

Schiavo argues that there is no extrinsic evidence tying him

to a conspiracy in 1990. See Sepulveda, 15 F.3d 1161, 1182 (1st 

Cir. 1993). Our earlier discussion of evidentiary sufficiency 

disposes of this assertion. Given the relevant standard of proof

-- more likely than not -- the evidence, absent Winter's

statement, easily supports the court's finding that the statement

was made during the course of a conspiracy involving Winter,

Schiavo and Farina.

Nor can its finding that the statement was made in

furtherance of the conspiracy be attacked. A statement furthers

a conspiracy if it "tends to advance the objects of the

conspiracy as opposed to thwarting its purpose." United States 

v. Masse, 816 F.2d 805, 811 (1st Cir. 1987) (internal quotation 

marks and citation omitted). Here, the identification of Schiavo

to the CI, then a key participant in the drug distribution chain,

clearly tended to further the goals of the conspiracy. See id. 

Winter's statement was properly admissible. 

D. Prosecutorial Vindictiveness 

On September 19, 1994, Schiavo filed a pretrial motion to

dismiss the superseding indictment asserting, inter alia, that 

the indictment was procured as a result of an abuse of the grand

jury process. In particular, he alleged that the government

convened the grand jury to shore up its weak case, violating the

spirit of United States v. Doe, 455 F.2d 1270 (1st Cir. 1972). 

After an evidentiary hearing, the motion was denied. Schiavo
 

805, 811 (1st Cir. 1987). 

-15-

abandons the grand jury theory on appeal, in favor of an

alternative claim that the superseding indictment was a product

of vindictive prosecution. As this claim was not advanced below,

we review for plain error. United States v. Santiago, 83 F.3d 

20, 25 (1st Cir. 1996); United States v. Whaley, 830 F.2d 1469, 

1476-77 (7th Cir. 1987) (vindictive prosecution claim).

A defendant may show vindictive prosecution by 1) producing

evidence of actual vindictiveness sufficient to show a due

process violation or 2) demonstrating that the circumstances show

there is a sufficient "likelihood of vindictiveness" to warrant a

presumption of vindictiveness. United States v. Marrapese, 826 

F.2d 145, 147 (1st Cir. 1987). Schiavo does not attempt to prove

actual vindictiveness, but insists that the following facts give

rise to the requisite presumption: 1) the superseding indictment

was returned soon after the government lost its appeal on the

suppression of the currency, 2) the indictment was not based on

the discovery of new evidence, and 3) the government expected

Schiavo to plead. Even assuming that a presumption of

vindictiveness could arise from pretrial conduct -- a scenario

that is questionable in light of United States v. Goodwin, 457 

U.S. 368, 381 (1982) ("There is good reason to be cautious before

adopting an inflexible presumption of prosecutorial

vindictiveness in a pretrial setting.") -- these facts are

deficient as a matter of law. The filing of a pretrial motion,

regardless of its successful outcome, and the failure of plea

negotiations are routine events unlikely to provoke a prosecutor

-16-

to "seek to penalize and deter." See id. Schiavo falls far 

short of demonstrating a "likelihood of vindictiveness," and

necessarily fails to establish plain error. 

-17-

E. Speedy Trial 

Schiavo claims a violation of the Speedy Trial Act, 18

U.S.C. 3161-74. Under the Act, trial must commence within 70

nonexcludable days following defendant's appearance before a

judicial officer of the court. Id. 3161(c)(1). On Schiavo's 

motion, the court determined that 578 of the 616 days between

Schiavo's initial court appearance on March 8, 1993, and the

start of his trial on November 14, 1994, were excludable, leaving

38 nonexcludable days to go on the speedy trial clock.13

Schiavo alleges that the court erred by excluding time

attributable to 1) his motion for pretrial release, 2) his motion

to reconsider pretrial release, 3) his motion for return of

property, and 4) a one week continuance. We review the court's

factual findings for clear error and its legal rulings de novo. 

United States v. Rodriguez, 63 F.3d 1159, 1162 (1st Cir. 1995).  

The Act excludes "delay resulting from any pretrial motion,

from the filing of the motion through the conclusion of the

hearing on, or other prompt disposition of, such motion." 18

U.S.C. 3161(h)(1)(F). We think that "any pretrial motion"

easily encompasses pretrial motions relating to pretrial release

or detention, and have previously held as much. See United 

States v. Noone, 913 F.2d 20, 27 (1st Cir. 1990) (pretrial 

detention). See also United States v. Lattany, 982 F.2d 866, 872 
 

13 This figure actually represented nonexcludable days that
had already passed. There were, in fact, 32 days to go on the
speedy trial clock.

-18-

n.6 (3d Cir. 1992); United States v. Wirsing, 867 F.2d 1227, 

1230-31 (9th Cir. 1989). We add that the court, in accordance

with 18 U.S.C. 3161(h)(1)(J), properly allowed only 30 days

exclusion after these motions were under advisement. See 

Rodriguez, 63 F.3d at 1163.  

The motion for return of property was a collateral matter

subsumed in the pretrial motions for release. It did not

separately account for any time excluded, and so is

inconsequential to Schiavo's claim. We need not address the

continuance, which accounted for six excludable days. Even if

exclusion were erroneous, there would still remain 26

nonexcludable days on the speedy trial clock. 

III. CONCLUSION

Having found no merit to Schiavo's claims, the judgment is 

Affirmed. 

-19-